# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>CRESTWOOD HOSPITALITY, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 4:21-bk-03091-BMW<br><br>**RULING AND ORDER REGARDING MOTION TO DETERMINE SECURED CLAIM OF BRYCON CONSTRUCTION, INC. PURSUANT TO 11 U.S.C. § 506 AND FED. R. BANKR. P. 3012** |

Before the Court is the *Motion to Determine Secured Claim of Brycon Construction, Inc. Pursuant to 11 U.S.C. § 506 and Fed. R. Bankr. P. 3012* (the "Valuation Motion") (DE 247)[1] filed by Brycon Construction, Inc. ("Brycon").[2]

In this proceeding, the Court is asked to determine the value of certain real property and improvements thereon[3] located at 620 E. Wetmore Road in Tucson, Arizona upon which Crestwood Hospitality, LLC (the "Debtor") operates a hotel (the "Hotel"). The Debtor and Brycon have stipulated to March 11, 2022 as the valuation date (the "Valuation Date") for determining the amount of Brycon's allowed secured claim in this case, for purposes of Brycon's treatment under the Debtor's plan of reorganization. (DE 282; DE 288).

---

[1] References to "DE" are references to the bankruptcy docket.
[2] The City of Tucson has joined in the Valuation Motion, but has not actively participated in these proceedings. (DE 251).
[3] Including related furniture, fixtures, and equipment.

On February 21, 2023, the parties filed their *Joint Pretrial Statement Regarding Valuation of Debtor's Hotel* (DE 308), and on February 28, 2023, the Court held an evidentiary valuation hearing (the "Valuation Hearing").

At the Valuation Hearing, testimony was provided by the Debtor's valuation expert, Michael Wright ("Mr. Wright") of Josephs Appraisal Group ("JAG"); Brycon's valuation expert, Chad Eschmeyer ("Mr. Eschmeyer") of Newmark Valuation & Advisory, LLC ("Newmark"); and the Vice President of the Debtor's management company, Michael Harris ("Mr. Harris").[4]

On March 17, 2023, the parties filed post-trial briefs, at which time the Court took this matter under advisement. (DE 318; DE 319).

Based upon the testimony and evidence presented, the arguments of counsel, and the entire record before the Court, the Court now issues its ruling.

## I. Jurisdiction

This is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334, 157(b)(2)(A), and 157(b)(2)(K). No party has contested this Court's jurisdiction to enter a final order with respect to this matter.

The following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 9014(c).

## II. Factual and Procedural Background

The Hotel is a three-story, 105-room lodging facility located near the Tucson Mall that was constructed in or about 2004. (TE 1 at 13-14;[5] TE 2 at 31; DE 310 at ¶ 11). In addition to guest rooms, the Hotel includes a lobby, office space, a kitchen and dining area where breakfast is offered, conference rooms, a fitness room, a business center, a sundries shop, a guest laundry room, and a pool/spa. (DE 310 at ¶ 11; TE 2 at 31). The Hotel operates as a Holiday Inn Express & Suites, which is an upper midscale, limited-service franchise line. (TE 2 at 31; DE 310 at

---

[4] Mr. Harris was not presented as an expert witness, and while he provided some factual insights, the Court gives his testimony little weight regarding valuation.

[5] References to "TE" are references to exhibits admitted into evidence during the Valuation Hearing.

¶¶ 8, 11; Trial Tr. 78:6-7;[6] *see also* Trial Tr. 127:21-23). The primary source of the Hotel's revenue is domestic and international leisure travel. (Trial Tr. 12:8-18; TE 1 at 87, 133).

On April 23, 2021 (the "Petition Date"), the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, commencing this case.

The Debtor has remained in possession since the Petition Date and it is the Debtor's intent to continue operating the Hotel under the same or a similar franchise brand following the conclusion of this bankruptcy case. (DE 318 at 2).

The parties agree that in order for the Debtor to continue operating the Hotel under its current brand or a similar brand, the Debtor will have to finance an estimated $1.5 million property improvement plan ("PIP") in the next one to two years. (DE 309 at ¶ 45; DE 318 at 2). The parties likewise agree that under a hypothetical sale scenario, any potential buyer of the Hotel would be required to fund an estimated $1.5 million PIP in order to assume or obtain an extension of a comparable franchise brand. (DE 309 at ¶ 45; DE 310 at ¶ 17; TE 1 at 3).

In the schedules, the Debtor valued its interest in the Hotel at approximately $6.3 million.[7] (DE 72 at 5, 7).

It is undisputed for purposes of this Valuation Hearing that First-Citizens Bank & Trust Company, successor by merger to CIT Bank, N.A. ("CIT Bank") has a first-position lien on the Hotel, the City of Tucson has a second-position lien on the Hotel, and Brycon has a third-position lien on the Hotel.

CIT Bank asserts a claim in an amount of no less than $6,815,558.18 (Proof of Claim 11-2), the City of Tucson asserts a claim in the amount of $86,134.88 (Proof of Claim 13-2), and Brycon asserts a claim in the amount of $1,361,241.54 (Proof of Claim 16-1). No objections to these claims have been filed.

In a *Stipulation in Aid of Confirmation* (the "CIT Stipulation") (DE 178), the Debtor and CIT Bank agree that the value of the Hotel is $6.6 million, and CIT Bank will have an allowed

---

[6] References to "Trial Tr." are references to the transcript of the Valuation Hearing.

[7] The Debtor states that this value is based, in part, on an appraisal that valued the Hotel as of November 2020. (*See* DE 72 at 7; DE 228 at 13). The Court notes that this appraisal is not in evidence before the Court.

secured claim of $6.6 million, plus an allowed unsecured deficiency claim in the amount of $215,558. The CIT Stipulation, however, has not been brought before the Court for approval.

On May 3, 2022, the Debtor filed an amended plan (the "Plan") and an amended disclosure statement (the "Disclosure Statement"). (DE 228; DE 229). In the Plan and Disclosure Statement, the Debtor takes the position that the Hotel is worth $6.6 million based upon the CIT Stipulation, rendering CIT Bank undersecured and the City of Tucson and Brycon entirely unsecured. (*See* DE 228 at 7-9, 13).

On May 3, 2022, the Court approved the Disclosure Statement and entered its *Order Setting and Notice of: 1. Approval of the Disclosure Statement; 2. Setting Confirmation Hearing; and 3. Fixing Deadlines to (i) Object to Plan, (ii) Vote on Plan, and (iii) Object to Discharge* (DE 231).

On July 19, 2022, Brycon filed an objection to the Plan and the Valuation Motion. Given the valuation dispute between Brycon and the Debtor, confirmation of the Plan has been held in abeyance pending resolution of this issue.

For purposes of this matter, Brycon retained Newmark to appraise the Hotel. In its report, Newmark concluded that the market value of the Hotel as of the Valuation Date was $12,600,000 (the "Newmark Appraisal"). (TE 1).

The Debtor retained JAG to appraise the Hotel. In its report, JAG concluded that the market value of the Hotel as of the Valuation Date was $5,990,000 (the "JAG Appraisal"). (TE 2).

### III. Legal Standard

Pursuant to § 506(a)(1) of the Bankruptcy Code:
> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

It is generally recognized that:

> Because the evaluation of property is less than an exact science, the Court is given wide latitude in determining value. Thus, a bankruptcy court is not bound by valuation opinions or reports submitted by appraisers, and may form its own opinion as to the value of property in bankruptcy proceedings.
>
> The Court may accept an appraisal in its entirety or may choose to give weight only to those portions of an appraisal that assist the Court in its determination. When competing appraisals are submitted, the court is required to consider portions of each to arrive at what it believes to be a realistic market value for the property. Heightened scrutiny is appropriate when two competent appraisals are presented by qualified appraisers stating widely divergent values.

*In re 218 Ludlow St. Corp.*, 455 B.R. 443, 447-448 (Bankr. W.D. Pa. 2011) (internal citations and quotations omitted); *see also In re Kinser Grp. LLC*, No. 2:20-bk-09355-DPC, 2020 WL 7633854, at *3 (Bankr. D. Ariz. Dec. 18, 2020).

**IV.     The Testimony and Exhibits**

The parties agree that, under the circumstances, the Court must determine the fair market value of the Hotel on the Valuation Date. Fair market value is generally defined as "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time." *In re Taffi*, 96 F.3d 1190, 1192 (9th Cir. 1996); *see also* TE 1 at 17; TE 2 at 8.

In this case, JAG and Newmark used two approaches to inform their respective opinions of fair market value as of the Valuation Date: (1) the sales comparison approach; and (2) the income capitalization approach. Neither considered a cost approach.

The sales comparison approach is based on the principle of substitution, and involves comparing the subject property to the sales of similar properties in order to develop an indication of market value. (TE 1 at 103-104; TE 2 at 35-36, 42). In the hotel context, sale prices are reduced to a price per guestroom figure, and then adjustments are made to the respective sale prices to account for various differences between the comparable properties and the subject property. (*See*

TE 1 at 104; TE 2 at 42). The adjusted prices are then used to calculate a value for the subject property. (*See* TE 1 at 104; TE 2 at 42).

The income capitalization approach reflects the market's perception of the relationship between a property's potential income and its market value by converting the anticipated economic benefits of owning property into a present value estimate. (TE 1 at 103, 158; TE 2 at 37). Both appraisers agree that the income capitalization approach is primarily relied upon to determine the fair market value of income-producing properties, like hotels. (TE 1 at 103, 146; TE 2 at 35, 37).

Two primary methods used to employ the income capitalization approach are the discounted cash flow method and the direct capitalization method. (TE 1 at 103).

The direct capitalization method converts an opinion of a single year's income expectancy into an indication of value. (TE 1 at 141). The determination of value under this approach is determined by dividing the estimated net operating income ("NOI") for a year by an appropriate capitalization rate. (Trial Tr. 69:15-22; TE 1 at 141; TE 2 at 41).

The discounted cash flow method, on the other hand, anticipates a property's future net income streams and future resale value over a holding period and then converts that value to present value. (TE 1 at 158).

Ultimately, each side disputes the particular methodology and ultimate opinion of value proffered by the other side's expert. The primary overarching differences between the two appraisals are: (1) whether the Hotel was stabilized on the Valuation Date;[8] (2) the income capitalization methodology used and the reliability of the data employed in connection therewith; and (3) the weight given to and comparables included in the experts' respective sales comparison approach analyses.

### A. Mr. Wright's Testimony and the JAG Appraisal Report

Mr. Wright is a Certified General Real Estate Appraiser in Arizona and the Head Commercial Appraiser of JAG. (DE 307 at ¶ 2). Mr. Wright testified that he dedicates

---

[8] Stabilization is achieved when a hotel's average daily revenue increases at inflationary levels and its occupancy rate remains constant. (Trial Tr. 90:6-11, 103:6-10).

approximately 5 to 10% of his time to the appraisal of hotel properties and that he has appraised approximately 5 to 10 hotels in the last two years. (Trial Tr. 102:4-9).

Mr. Wright personally inspected the Hotel on January 17, 2023 and was given STR reports and Hotel financials for January 2020 through August 2022, as well as an interview with the Hotel's management, to complete his appraisal. (DE 307 at ¶ 9; Trial Tr. 110:7-24, 130:13-17; *see* TE 2 at 39). He was not provided with, nor did he review, any historical pre-pandemic financial information about the Hotel in preparing the JAG Appraisal. (Trial Tr. 110:15-20).

Based upon his experience and the information available to him, Mr. Wright opined that the Hotel was stabilized as of the Valuation Date.[9] (Trial Tr. 120:10-12; *see also* TE 2 at 37). He further opined that the income capitalization approach, and specifically the direct capitalization method, is most commonly used to value a stabilized property like the Hotel. (Trial Tr. 107:17-108:3; TE 2 at 37).

In order to complete his direct capitalization analysis, Mr. Wright relied primarily on the Hotel's financial statements for the period of January 2022 through August 2022 (the "January-August 2022 Financials").[10] (*See* TE 2 at 37-40; Trial Tr. 127:4-9).

Mr. Wright employed an NOI of $570,765 in his direct capitalization analysis based upon an estimated gross annual income of $3,365,318, which figure was derived from the revenue per available room values reflected in the January-August 2022 Financials, and estimated gross annual expenses of $2,794,553 derived from unspecified market estimates and owner-reported expenses. (TE 2 at 39-41).

Included in Mr. Wright's estimated gross annual expenses are $201,919 attributed to City Transaction Privilege Tax & Use Taxes, which are pass-through taxes, and $404,507 attributed to Capital Improvements, which Capital Improvements include costs associated with the anticipated PIP. (TE 2 at 40; Trial Tr. 158:17-23).

---

[9] Mr. Wright testified during cross-examination that he believed the Hotel was stabilized in reference to the COVID-19 pandemic as of the Valuation Date, but he was unsure whether the pendency of this bankruptcy case as of the Valuation Date had an impact on the stabilization of the Hotel. (Trial Tr. 103:2-104:4).

[10] The JAG Appraisal includes incorrect statements regarding the date ranges of the data reviewed. (Trial Tr. 109:20-110:174).

Mr. Wright then divided that NOI by a capitalization rate of 9.4% to arrive at a direct capitalization value of $6.072 million. (TE 2 at 41; Trial Tr. 112:18-20, 113:25-114:4).

Mr. Wright testified that he used a 9.4% cap rate for his analysis based upon the condition of the Hotel and a comparable hotel sale in the Tucson market which reported a cap rate of 10%. (Trial Tr. 113:3-12; *see also* TE 2 at 41). Mr. Wright acknowledged, however, that his market participant survey reflected that a cap rate of anywhere between 6 and 10% would be acceptable. (Trial Tr. 112:21-24; TE 2 at 41).

In addition to completing a direct capitalization analysis, Mr. Wright performed a sales comparison analysis.

For his sales comparison analysis, Mr. Wright chose five hotel property sales from within the Tucson market that closed between September 7, 2021 and April 29, 2022 for between $40,541 and $94,937 per unit. (TE 2 at 42-49). Mr. Wright then made certain adjustments to the comparable property sale prices based upon market conditions, location, and the respective hotels' characteristics, including the relationship of the hotel to a franchise, the number of guestrooms, the hotel's class rating and type, the building area, the age of improvements, the quality of construction, the condition of the hotel, and the amenities offered. (TE 2 at 49-51).

Based upon a weighted comparison of the adjusted comparable sale prices, Mr. Wright opined that the price per unit under the sales comparison approach applicable to the Hotel as of the Valuation Date was $56,228. (TE 2 at 52). Given this price per unit estimate, Mr. Wright concluded that the market value of the Hotel as of the Valuation Date under the sales comparison approach was $5.904 million. (TE 2 at 52).

To reach his ultimate conclusion of value, Mr. Wright gave equal consideration to his income capitalization and sales comparison analyses and opined that the Hotel had an "as is" market value of $5.99 million as of the Valuation Date. (TE 2 at 53).

### B. Mr. Eschmeyer's Testimony and the Newmark Appraisal Report

Mr. Eschmeyer is a Certified General Real Estate Appraiser in Arizona and a Senior Vice President at Newmark whose professional focus is resorts and hospitality properties. (DE 310 at

¶¶ 1-2; Trial Tr. 144:17-18). Mr. Eschmeyer testified that he has completed approximately 200 hospitality appraisals in the last two years. (Trial Tr. 144:23-25).

Mr. Eschmeyer personally inspected the Hotel on the Valuation Date and considered historical financial data provided by the Debtor for the period of January 2018 through February 2022, projections provided by the Debtor's management, market data, and interactions with market participants to complete his appraisal. (DE 310 at ¶¶ 7, 28; TE 1 at 111, 116, 119).

Mr. Eschmeyer opined that the Hotel was not stabilized as of the Valuation Date. (DE 310 at ¶¶ 29-30; Trial Tr. 138:8-10). It is his opinion, based upon a review of market data, conversations with market participants, and the Debtor's historical financial data, that the Hotel will be stabilized by approximately March 11, 2024, two years after the Valuation Date. (DE 310 at ¶ 30; TE 1 at 18; Trial Tr. 48:22-24).

With this in mind, Mr. Eschmeyer primarily relied on the income capitalization approach, and specifically the discounted cash flow method, to reach his ultimate opinion of value. (DE 310 at ¶¶ 33, 38; Trial Tr. 36:16-18, 37:16-18). Mr. Eschmeyer took this approach because, in his experience, it is the method that is most widely used to appraise income-producing properties like the Hotel, and is the valuation method that is most widely used in the hospitality industry. (DE 310 at ¶¶ 22, 33; Trial Tr. 37:16-18, 46:16-19).

In Mr. Eschmeyer's opinion, whereas the direct capitalization method may not capture the stabilized value of an asset depending on the year being analyzed, the benefit of relying primarily on a discounted cash flow analysis is that such analysis accounts for the near-term knowledge of the market and the subject property, and projects that information in a way that captures the stabilized performance of the asset. (Trial Tr. 93:14-94:3).

In general terms, Mr. Eschmeyer's discounted cash flow analysis estimates the amount of cash that the Hotel will generate over a standard 10-year holding period, and then discounts that dollar amount to present value. (DE 310 at ¶ 34).

For purposes of his discounted cash flow analysis, Mr. Eschmeyer projected that the Hotel would have an NOI of approximately $560,000 in year one, which NOI he projected would increase to approximately $1.25 million during the 2024-2025 stabilization year after completion

of the anticipated PIP, and which NOI he projected would grow steadily thereafter to approximately $1.5 million in year ten. (TE 1 at 124-125).

Mr. Eschmeyer then determined, based on market data, interviews with market participants, and factors particular to the Hotel, that the Hotel would likely command a discount rate of 10.5% and a terminal capitalization rate of 8.5%.[11] (DE 310 at ¶ 35; TE 1 at 127-137, 161; *see also* Trial Tr. 62:10-63:10, 66:11-17).

After applying the discount rate to annual NOI for years 1-10 and the terminal capitalization rate in year 11, Mr. Eschmeyer factored in a capital deduction to account for the anticipated PIP, and arrived at a final discounted cash flow value of $12.6 million. (TE 1 at 137).

Mr. Eschmeyer then used the direct capitalization method to cross-check his discounted cash flow analysis. (Trial Tr. 69:7-12).

Based upon his opinion that the Hotel was not stabilized as of the Valuation Date, Mr. Eschmeyer used the projected NOI as of his projected 2024/2025 stabilization year to calculate a direct capitalization value for the Hotel. (DE 310 at ¶ 29; Trial Tr. 71:3-14).

Mr. Eschmeyer then applied an 8% capitalization rate, which rate he selected based on comparable property sales, investor surveys, the mortgage-equity technique, risk characteristics, and market conditions, to his projected stabilized NOI and then reduced the resulting dollar amount to present value to arrive at a $12.2 million direct capitalization value. (DE 310 at ¶ 32; TE 1 at 141-145).

As a final step, Mr. Eschmeyer used the sales comparison approach to verify that his income capitalization analyses realized a reasonable value in light of recent market activity. (DE 310 at ¶ 26; Trial Tr. 73:21-25; TE 1 at 146). For his sales comparison analysis, Mr. Eschmeyer selected seven hospitality properties in the Tucson market with sale dates ranging from January 2020 through December 2021 and sale prices of between $5.1 million ($62,195 per unit) and $25.5 million ($212,500 per unit) to compare against the Hotel. (DE 310 at ¶ 23; TE 1 at 104-110; Trial Tr. 74:11-16). Mr. Eschmeyer testified that there were no directly comparable hotel

---

[11] Generally speaking, the higher the terminal capitalization and/or discount rate, the higher the risk and the lower the value. (Trial Tr. 63:1-2; 66:19-22).

sales during the relevant time period, so he bracketed the subject property, i.e. compared it against properties that were both superior and inferior to the Hotel to illustrate a range in value for the Hotel. (Trial Tr. 94:4-22). The properties Mr. Eschmeyer used for comparison ranged from economy class to upper upscale class, and from limited-service to full-service. (DE 310 at ¶ 23; TE 1 at 105).

Like Mr. Wright, Mr. Eschmeyer then made adjustments to the comparable sales prices based on market conditions, location, and physical characteristics, before concluding that under the sales comparison approach, the Hotel had a value of between $10 million and $18.1 million (based on an adjusted price of between $95,000 and $172,000 per unit) as of the Valuation Date. (TE 1 at 107-110).

In his final reconciliation of value, Mr. Eschmeyer gave primary weight to the discounted cash flow analysis and opined that the "as is" market value of the Property as of the Valuation Date was $12.6 million. (DE 310 at ¶¶ 6, 38; TE 1 at 146-151).

## V. Analysis and Determination of Value

The Court has considered all of the evidence and has evaluated each appraiser's expertise, methodology, rationale, and credibility.

As an initial matter, the Court acknowledges that Mr. Wright and Mr. Eschmeyer are both certified appraisers, and the Court finds both to be credible expert witnesses. However, the Court notes that Mr. Eschmeyer specializes in hospitality appraisals, whereas Mr. Wright's experience in appraising such properties is extremely limited.

### 1. Stabilization and Methodology

The experts agree that the income capitalization approach is generally considered to be the best and most accurate measure for valuing income-producing properties like the Hotel. (TE 1 at 103, 146; TE 2 at 35, 37).

They also agree that stabilization is an important factor to consider when determining which income capitalization methodology or methodologies to employ, and when determining how much weight to give to each such methodology. (*See* TE 2 at 37; Trial Tr. 139:3-6, 148:25-149:2). Generally speaking, the discounted cash flow method is used to value a property that is

not stabilized. (Trial Tr. 148:25-149:5). If a property is stabilized, the direct capitalization method can provide an accurate representation of the property's value. (TE 1 at 141; TE 2 at 37; *see also* Trial Tr. 139:3-6).

The JAG Appraisal determined that the Hotel was stabilized as of the Valuation Date and therefore that "direct capitalization is considered the most appropriate method to value the subject property." (TE 2 at 37). Mr. Wright reiterated this during his testimony, stating that as of the Valuation Date, the Hotel was "stabilized in reference to COVID-19 and its impact on the property." (Trial Tr. 120:8-9). However, Mr. Wright further testified that he was only given financial information for the Hotel for the period of January 2020, which was shortly before the World Health Organization declared the COVID pandemic, through August 2022, at which time the pandemic declaration remained in effect.

The Court further notes that in the first quarter of 2022, in which quarter the Valuation Date falls, there was a worldwide surge in COVID-19 cases attributed to the Omicron variant, public transportation mask requirements were in effect nationwide, and COVID vaccination and testing policies were in effect for certain travelers, all of which conditions impacted the hospitality industry. *See* Centers for Disease Control and Prevention, *CDC Museum COVID-19 Timeline*, https://www.cdc.gov/museum/timeline/covid19.html (accessed May 5, 2023).

Given this backdrop, and given the historical financial data included in Mr. Eschmeyer's appraisal report, the Court does not accept Mr. Wright's assessment that the Hotel was stabilized as of the Valuation Date. To the contrary, the Court finds Mr. Eschmeyer's conclusion that the Hotel was not stabilized as of the Valuation Date and will stabilize in approximately March of 2024 to be persuasive.

Based upon the foregoing, under the framework presented in both appraisal reports, it is the determination of the Court that the discounted cash flow method, and not the direct capitalization method, provides the best evidence of value of the Hotel. (*See* TE 1 at 141; TE 2 at 37, opining that the direct capitalization method is the most commonly applied method to value <u>stabilized</u> properties).

## 2. Newmark's Discounted Cash Flow Analysis

As explained above, the discounted cash flow method is most informative to this Court's analysis. However, the only discounted cash flow analysis before the Court is the discounted cash flow analysis included in the Newmark Appraisal.[12]

The Debtor argues that Newmark's discounted cash flow analysis relies on speculative assumptions that are inconsistent with the historic and current performance of the Hotel, applicable market conditions, and reasonable risks. In particular, the Debtor argues that Newmark's discounted cash flow analysis does not adequately address the impact and cost of the anticipated PIP, does not consider the Hotel's current physical condition or performance, is based on faulty and unsupported assumptions, uses unrealistic NOI projections, and employs inappropriately low terminal capitalization and discount rates.

The Court, however, does not find the Debtor's critiques of Newmark's discounted cash flow analysis to be persuasive.

Contrary to the Debtor's assertions, Mr. Eschmeyer's discounted cash flow analysis factored in a present value capital deduction of $1,336,350 to address the impact and cost of the anticipated PIP on the value of the Hotel. In addition, Mr. Eschmeyer's NOI projections are supported by the Debtor's financial statements and reasonable assumptions regarding the state of and anticipated changes to the economy, the Tucson market,[13] the date of stabilization, and the impact of the anticipated PIP.[14] Further, Mr. Eschmeyer reasonably relied upon pre- and post-pandemic historical financial data, his inspection of the Hotel, and market evidence to calculate the terminal capitalization and discount rates and complete his discounted cash flow analysis.

In sum, the Court finds Mr. Eschmeyer's discounted cash flow analysis to be credible and entitled to significant weight.

---

[12] The Court notes that Mr. Wright testified that he did not prepare a discounted cash flow analysis because he was not asked to do so. (Trial Tr. 109:2-9).

[13] The Court notes that Tucson is on the New York Times' list of the "52 Places for Travelers to Visit in 2023," is one of Time Magazine's "Greatest Places of 2023," and was named one of the "Best Food Cities in the U.S." by Travel + Leisure Magazine.

[14] The Court notes that Mr. Eschmeyer's starting projections for the 2022/2023 year are lower than the projections used by the Debtor's own expert. (*Compare* TE 2 at 39-41 *with* TE 1 at 124).

### 3. The Direct Capitalization Analyses

Although the discounted cash flow method is of primary importance to the valuation at issue, Mr. Wright and Mr. Eschmeyer each included a direct capitalization analysis in their respective reports.

The direct capitalization analysis was used for different purposes and given different weight by each expert. As stated above, Mr. Wright used direct capitalization as the preferred income capitalization approach and gave it equal weight with the sales approach. Mr. Eschmeyer used direct capitalization as a cross-check to his discounted cash flow analysis.

The Court has already determined that the discounted cash flow analysis is the correct income capitalization approach entitled to the most weight given that the Hotel was not stabilized as of the Valuation Date.

Upon consideration of the testimony, the Court further finds that there are significant weaknesses in Mr. Wright's direct capitalization analysis. Mr. Wright's direct capitalization analysis relies upon only eight months of financial information, rather than a full year, and, as noted above, it reflects the capitalization of a depressed year. In addition, the income component of Mr. Wright's direct capitalization analysis fails to account for miscellaneous revenue streams, and improperly incorporates sales tax and inflated capital deduction expenses. Sales taxes are pass-through taxes, and the anticipated PIP, which is the primary component of Mr. Wright's capital deductions line-item, is not an expense that exists in perpetuity. (*See* Trial Tr. 141:17-142:14, 158:17-3).

Mr. Eschmeyer's analysis, on the other hand, realizes a credible direct capitalization value for the Hotel based upon projected NOI as of stabilization, which projected NOI is supported by the Debtor's financial data, and a capitalization rate supported by market evidence.[15]

Based upon the foregoing, it is this Court's determination that Mr. Wright's direct capitalization analysis is entitled to little weight and that Mr. Eschmeyer's direct capitalization analysis is credible and entitled to the weight afforded to it in the Newmark Appraisal.

---

[15] The capitalization rate of 8% used by Mr. Eschmeyer is also within the range deemed appropriate by Mr. Wright. (Trial Tr. 112:21-24; TE 2 at 41).

### 4. The Sales Comparison Analyses

The experts agree that buyers of hotel properties do not typically rely on the sales comparison approach to determine value. (Trial Tr. 94:23-95:2, 126:7-9). In line with this framework, Mr. Eschmeyer employed the sales comparison approach to cross-check his income capitalization analyses. Mr. Wright, on the other hand, perplexingly gave equal weight to the sales comparison and income capitalization analyses in his final reconciliation of value.

Of the five sales used by Mr. Wright in his sales comparison analysis, only two involved upper midscale, limited-service hotels affiliated with franchises, like the Hotel. (*See* TE 2 at 44-49). The three other properties used in Mr. Wright's Sales Comparison Approach analysis are inferior to the Hotel in terms of franchise status, class and/or type. (*See* TE 2 at 44-49). Further, based upon the testimony of Mr. Eschmeyer, the Court does not find certain of Mr. Wright's adjustments, and in particular those made to address differences in market conditions, location, and franchise status, to be persuasive. (Trial Tr. 145:1-148:11).

With respect to the Newmark Appraisal, although the Debtor takes issue with the properties used and the wide range of values Mr. Eschmeyer opines the Hotel falls within, the Court finds Mr. Eschmeyer's sales comparison approach to be reasonable in light of the minimal number of hotel sales during the relevant period of time, and given that Mr. Eschmeyer only used the sales comparison analysis as a cross-check to confirm that his income capitalization analyses generated values consistent with the market.

Ultimately, the Court accepts Mr. Eschmeyer's position that there were no truly comparable property sales during the relevant time period, and therefore gives minimal weight to the experts' respective sales comparison analyses. This is supported by the experts' agreement that this approach is typically not relied upon for hotel properties.

## VI. Conclusion

It is the determination of the Court that Mr. Wright's misdirected reliance on the direct capitalization method, failure to include an analysis under the discounted cash flow method, and the deficiencies in and untenable weight given to the sales comparison approach render the JAG Appraisal and ultimate opinion of value materially flawed and unreliable. The Newmark

Appraisal, on the other hand, appropriately gives primary weight to the discounted cash flow method, under the income capitalization approach, and uses the direct capitalization method and sales comparison approach as cross-checks. It is the determination of the Court, for the reasons set forth above, that the Newmark Appraisal provides a credible and reliable opinion of market value for the Hotel.

Based upon the evidence presented and the totality of the record before the Court, the Court concludes that the fair market value of the Hotel for purposes of 11 U.S.C. § 506(a)(1) and plan confirmation is $12,600,000.

Wherefore, for good cause shown;

**IT IS HEREBY ORDERED** that the Hotel's "as is" fair market value as of the Valuation Date was $12,600,000.