# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| CRESTWOOD HOSPITALITY LLC, | Case No. 4:21-bk-03091-BMW |
| Debtor. | **RULING AND ORDER REGARDING CONFIRMATION OF THE THIRD AMENDED DEBTOR PLAN (DKT. 419) AND THE FIRST AMENDED BRYCON PLAN (DKT. 417)** |

Before the Court are the *Third Amended Plan of Reorganization Dated March 11, 2024* (Dkt. 419; Trial Ex. 14)[1] filed by Crestwood Hospitality, L.L.C (the "Debtor") on March 11, 2024, as amended and modified by the *Joint Stipulation Regarding Assumption of Oracle America, Inc.'s Contracts and Cure Amount Pursuant to the Debtor's Third Amended Plan of Reorganization Dated March 11, 2024* (Dkt. 436; *see also* Dkt. 439; Dkt. 444) and the *Debtor's (A) Non-Adverse Modifications to Third Amended Plan of Reorganization Dated March 11, 2024 and (B) Motion for Order Deeming Plan Modifications to be Accepted by the Parties Who Previously Accepted Such Plan* (Dkt. 457; Trial Ex. 22) (the "Debtor Plan"); *Brycon Construction, Inc.'s Amended Plan of Liquidation for Debtor Dated March 8, 2024* (Dkt. 417)[2]

---

[1] Unless otherwise indicated, the Court will include both docket entry and trial exhibit citations for documents that were both filed on the docket and admitted into evidence during the contested confirmation hearing.

[2] Dkt. 417 is included in Trial Ex. 15. However, Trial Ex. 15 contains both *Brycon Construction, Inc.'s Amended Plan of Liquidation for Debtor Dated March 8, 2024* (Dkt. 417) and the *Stipulation in Aid of*

filed by Brycon Construction, Inc. ("Brycon") on March 8, 2024, as amended and modified by the *Stipulation in Aid of Confirmation of Brycon Construction, Inc.'s Amended Plan of Liquidation for Debtor Dated March 8, 2024* (Dkt. 430)[3] and the *Joint Stipulation Regarding Assumption of Oracle America, Inc.'s Contracts and Cure Amount Pursuant to Brycon Construction, Inc.'s Amended Plan of Liquidation for Debtor Dated March 8, 2024* (Dkt. 442; *see also* Dkt. 445) (the "Brycon Plan"); *First-Citizens Bank & Trust Company's Objection to the Debtor's Third Amended Plan of Reorganization Dated March 11, 2024* (Dkt. 432; Trial Ex. 16); *Brycon Construction, Inc.'s Objection to Debtor's Third Amended Plan of Reorganization Dated March 11, 2024* (Dkt. 433; Trial Ex. 17); *First-Citizens Bank & Trust Company's Supplemental Objection to the Debtor's Modified Third Amended Plan of Reorganization Dated March 11, 2024* (Dkt. 472; Trial Ex. 23); Brycon's *Joinder to First-Citizens Bank & Trust Company's Supplemental Objection to the Debtor's Modified Third Amended Plan of Reorganization Dated March 11, 2024* (Dkt. 473; Trial Ex. 24); the *Debtor's Objection to Confirmation of Brycon Construction, Inc.'s Amended Plan of Liquidation for Debtor Dated March 8, 2024* (Dkt. 434; Trial Ex. 18); the *Joinder to Debtor's Objection to Confirmation of Brycon Construction, Inc.'s Amended Plan of Liquidation for Debtor Dated March 8, 2024* (Dkt. 435) filed by interest holders Sukhbinder Khangura ("Mr. S. Khangura") and Rupinder Khangura ("Ms. R. Khangura"); and all filings related thereto.

A contested confirmation was conducted on December 11, 2024 and December 12, 2024 (the "Confirmation Hearing"), at which hearing the Debtor, Brycon, and First-Citizens Bank & Trust Company, as successor by merger to CIT Bank, N.A. ("FCB" and/or "CIT") presented evidence. Testimony was provided by Kevin Freis ("Mr. Freis"), the Vice President of Construction and representative of Brycon; Chad Eschmeyer ("Mr. Eschmeyer"), Senior Vice President of Newmark Valuation & Advisory, LLC, a Certified General Real Estate Appraiser, and an expert in the area of hotel valuations; Keith Bierman ("Mr. Bierman"), Senior Managing

---

[3] *Confirmation of Brycon Construction, Inc.'s Amended Plan of Liquidation for Debtor Dated March 8, 2024* (Dkt. 430). In order to avoid confusion, the Court recognizes that both documents were admitted into evidence, but the Court will cite only to the respective docket entries, Dkt. 417 and Dkt. 430.
[3] See *supra* n.2.

Director of MCA Financial Group, Ltd. and an expert in the area of plan feasibility and cramdown interest rates; Mr. S. Khangura, the Managing Member of the Debtor; Michael Harris ("Mr. Harris"), an owner and manager of Ledgestone Hospitality, LLC ("Ledgestone"), the Debtor's management company, and an expert in the area of hospitality management and the hospitality industry; and Matthew Leach ("Mr. Leach"), President of Horizon Mortgage Capital Corporation and a commercial mortgage broker.[4]

The Debtor, Brycon, and FCB submitted post-trial briefs on January 24, 2025,[5] at which time the Court took this matter under advisement.

Based upon the pleadings, arguments of counsel, testimony offered, exhibits admitted into evidence, and entire record before the Court, the Court now issues its ruling.

## I. <u>Jurisdiction</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

This is a contested matter governed by Federal Rule of Bankruptcy Procedure 9014, and the following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this matter by Federal Rules of Bankruptcy Procedure 9014(c) and 7052.

## II. <u>Findings of Fact</u>

### A. Background

The Debtor is an Arizona limited liability company that was formed in 1999. (Dkt. 499 at 6, ¶ II.A.1; Dkt. 508 at 4, ¶ 12). The Debtor's members are the Sukhbinder & Rupinder Khangura Family Revocable Trust dated May 19, 2008 (the "S & R Trust") and the Jasbir Khangura Revocable Trust dated July 13, 2013 (the "J Trust," and collectively with the S & R Trust, the "Interest Holders"). (Dkt. 499 at 6, ¶ II.A.2; Dkt. 508 at 4, ¶ 13). The beneficiaries of the S & R

---

[4] Although Mr. S. Khangura testified that Mr. Leach was employed by himself personally and/or the members of the Debtor (12/11/2024 Trial Tr. 158:11-15), according to Mr. Leach, his firm's engagement letter is with the Debtor (12/12/2024 Trial Tr. 17:4-16, 31:7-12). Neither Mr. Leach's nor his firm's employment has been approved by this Court, nor has Court approval been requested. (*See* 12/12/2024 Trial Tr. 61:4-14).

[5] Dkt. 549; Dkt. 550; Dkt. 551; Dkt. 553.

Trust are Mr. S. Khangura and Ms. R. Khangura, and the beneficiary of the J Trust is Jasbir Khangura ("Mr. J. Khangura"). (Dkt. 499 at 6, ¶ II.A.3; Dkt. 508 at 4, ¶ 14). Mr. S. Khangura is the manager of the Debtor. (Dkt. 508 at 1, ¶ 2).

The Debtor owns a hotel located at 620 E. Wetmore Road in Tucson, Arizona that was constructed in or about 2004 (the "Hotel" or "Property"). (Dkt. 499 at 6, ¶¶ II.B.7-8; Dkt. 508 at 4, ¶ 16). The Hotel currently operates as a Holiday Inn Express® & Suites (a "Holiday Inn Express") pursuant to a license agreement (the "Franchise Agreement") with Holiday Hospitality Franchising, LLC (the "Franchisor").[6] (Dkt. 499 at 6, ¶ II.B.9; Dkt. 508 at 4, ¶ 18; *see also* Trial Ex. 36). The Hotel has 105 guest rooms, a lobby, corporate meeting space, a kitchen and dining area, a fitness center, a business center, a pool/spa, and other guest amenities. (Dkt. 499 at 7, ¶ II.B.12; Dkt. 505 at 3, ¶ 13; Dkt. 508 at 5, ¶ 22). The primary source of the Hotel's revenue is domestic and international leisure travel. (Dkt. 499 at 4, § I). Ledgestone has managed the Property since February 2019, and Ledgestone continues to manage the Property pursuant to a management agreement (the "Ledgestone Management Agreement"). (Dkt. 499 at 7, ¶¶ B.14-15; Dkt. 508 at 5 at ¶¶ 24-25; Dkt. 509 at 2, ¶¶ 11, 13; 12/12/2024 Trial Tr. 93:13-18; Trial Ex. 37).

The Debtor is affiliated with several other entities through common ownership, including Optima Lodging, LLC ("Optima"), which owns real property and a hotel that are operated as a Fairfield Inn and Suites (the "Fairfield Inn") in Oro Valley, Arizona; Santa Fe Hospitality, LLC ("Santa Fe"), which is a party to the Fairfield Inn franchise agreement and other operating contracts related to the Fairfield Inn; and Legacy Hospitality, LLC ("Legacy"), which owns a Residence Inn (the "Residence Inn") in Mesa, Arizona. (Dkt. 508 at 14, ¶ 89; 12/11/2025 Trial Tr. 155:23-156:12, 156:18-24). Legacy, Optima, and Santa Fe will hereinafter be referred to as the "Affiliates." The Residence Inn and the Fairfield Inn will hereinafter be referred to as the "Affiliate Properties."

---

[6] The Franchise Agreement originally provided that it would expire by its terms on January 26, 2024. (Dkt. 499 at 7, § II.B.10; Dkt. 508 at 5, ¶ 19). However, the Debtor and Franchisor have agreed to extend the term of the Franchise Agreement to January 26, 2026, on certain conditions, including that the Debtor make certain improvements to the Property. (Dkt. 499 at 7, § II.B.11; Dkt. 508 at 5, ¶ 20). Mr. S. Khangura testified that the Debtor has complied with the requirements of the extension stipulation with the Franchisor. (Dkt. 508 at 5, ¶ 21).

### B. Events Leading to the Bankruptcy Filing

On April 1, 2021, FCB commenced an action in Maricopa County Superior Court against the Debtor and guarantors for breach of contract and breach of guaranty pertaining to a loan agreement secured by the Property (the "Initial State Court Action"). (Dkt. 499 at 6, ¶ II.A.4). On April 15, 2021, the parties to the Initial State Court Action entered into a stipulation for the appointment of a receiver. (Dkt. 499 at 6, ¶ II.A.4). On April 23, 2021 (the "Petition Date"), the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition"), commencing this case. FCB's loan matured approximately three months thereafter, on July 14, 2021. (Dkt. 499 at 9, ¶ II.E.27).

### C. The Claims in this Case

FCB, the City of Tucson (the "City"), and Brycon have claims secured by the Hotel. (Dkt. 499 at 7, ¶ II.C.16; Dkt. 508 at 6-7, ¶ 36). It is undisputed for purposes of this proceeding that FCB has a first-position lien on the Hotel, the City has a second-position lien on the Hotel, and Brycon has a third-position lien on the Hotel. (Dkt. 499 at 4, § I).

FCB asserts a claim in an amount of no less than $8,029,771.04 as of May 1, 2023, plus all accrued and accruing interest, late charges, attorneys' fees and costs, and all other amounts chargeable under FCB's loan documents and applicable law. (Dkt. 499 at 4, § I; Proof of Claim 11-3). The City asserts a claim in an amount of no less than $86,134.88. (Dkt. 499 at 4, § I; Proof of Claim 13-2). Brycon asserts a claim in an amount of no less than $1,361,241.54.[7] (Dkt. 499 at 4, § I & at 7; Proof of Claim 16-1).

In addition to FCB, the City, and Brycon, the U.S. Small Business Administration (the "SBA") has filed a claim in the amount of $518,082.19 secured by certain of the Debtor's personal property (Proof of Claim 2-1), Canyon Community Bank, N.A. ("Canyon") has filed a claim in the amount of $8,681.20 secured by certain funds on deposit with Canyon (Proof of Claim 4-3), the Debtor has scheduled Kevin Johnston ("Mr. Johnston") as the holder of a claim

---

[7] Brycon takes the position that as of November 19, 2024, it was owed $1,361,241.54 in principal and $724,861.15 in interest, with interest continuing to accrue at the rate of $378.12 per day. (Dkt. 507 at 3, ¶ 8). Brycon has also filed an application for an administrative expense claim which has not been brought before the Court for consideration. (Dkt. 556).

in the amount of $8,175.80 secured by certain personal property (Dkt. 72 at 13; Trial Ex. 2 at 13), and the Debtor has scheduled Mohammed Rayhan Khan ("Mr. Khan") as the holder of a claim in the amount of $9,887.40 secured by certain personal property (Dkt. 72 at 14; Trial Ex. 2 at 14).

Aside from administrative expense claims, the only outstanding priority claim in this case is a claim in the amount of $395,352.86 filed by the Arizona Department of Revenue ("ADOR"), which claim pertains to unpaid transaction privilege taxes (the "ADOR Priority Claim") (Proof of Claim 1-5). The non-insider general unsecured claims and deficiency claims in this case are estimated to total approximately $850,000. (Dkt. 499 at 8, ¶ II.D.f; Dkt. 508 at 8, ¶ 43.f).

The Debtor does not concede the validity or amount of any of the claims asserted in this case. (Dkt. 499 at 16, ¶ III.B.1.1). However, there are no claim objections that have been brought before the Court for consideration.

**D.    The Value of the Property**

During the pendency of this case, the Court determined that the fair market value of the Property as of March 11, 2022 was $12,600,000 (the "Valuation Proceedings"). (Dkt. 338; Trial Ex. 7; Dkt. 499 at 12, ¶ II.E.52). During the Valuation Proceedings, the Court found Brycon's expert valuation witness, Mr. Eschmeyer, to be credible, and the Court found Mr. Eschmeyer's appraisal to be persuasive and entitled to significant weight. (*See* Dkt. 338; Trial Ex. 7).

According to an updated appraisal report prepared by Mr. Eschmeyer (the "2024 Newmark Appraisal"), the "as-is" fair market value of the Property as of September 5, 2024 was $13,000,000 (Real Property $12,775,000, FF&E $225,000), and the stabilized value of the Property as of September 5, 2026 is expected to be $17,200,000 (Real Property $16,245,000, FF&E $955,000). (Dkt. 505 at 5, ¶ 18; Dkt. 505 at 12; Trial Ex. 47 at 4; *see also* Dkt. 499 at 14, ¶¶ II.F.65-II.F.66). Fair market value presumes "[a] reasonable time is allowed for exposure in the open market[.]" (Dkt. 505 at 27-28; Trial Ex. 47 at 19-20). Mr. Eschmeyer's opinions as to the fair market value of the Property also assume near-term capital commitments in the form of a property improvement plan (a "PIP"), which Mr. Eschmeyer has estimated will cost approximately $2,100,000, and which the parties agree will be needed in order for the Debtor to

retain its Holiday Inn Express flag or convert the Property to another hospitality flag after the expiration of the Franchise Agreement in January 2026. (Dkt. 505 at 60-61; Trial Ex. 47 at 52-53; Dkt. 418 at § XIII.A; Trial Ex. 13 at § XIII.A; Dkt. 504 at 16; Trial Ex. 48 at 4).

According to the 2024 Newmark Appraisal, in the event the Property is allowed insufficient time to sell on the open market, it is likely to achieve a liquidation value. (Dkt. 505 at 160; Trial Ex. 47 at 152). As explained and opined by Mr. Eschmeyer in the 2024 Newmark Appraisal:

> Liquidation value is typically lower than fair market value. Unlike cash or securities, certain illiquid assets, like real estate, often require a period of several months in order to obtain their fair market value in a sale, and will generally sell for a significantly lower price if a sale is forced to occur in a shorter time period. Liquidation value may be either the result of a forced liquidation or an orderly liquidation. Either value assumes that the sale is consummated by a seller who is compelled to sell and assumes an exposure period which is less than normal for the market. Based on conversations with lenders, buyers, and operators of properties of this type, the most likely discount that would be applied to the selling price (assuming approximately 90 days of marketing and exposure time) would be 40.0%, rendering a liquidation value of $7,800,000.

(Dkt. 505 at 160; Trial Ex. 47 at 152).

Brycon estimates that the liquidation value of the Property as a non-operating hotel with no franchise flag in place, is $7,000,000. (Dkt. 416 at § XIII.A.1; Trial Ex. 12 at § XIII.A.1; Dkt. 499 at 45, ¶ III.C.2.14). However, this figure is not supported by any evidence.[8] (*See* Dkt. 416 at § XIII.A.1; Trial Ex. 12 at § XIII.A.1; Dkt. 499 at 45, ¶ III.C.2.14).

The Debtor is in agreement with the conclusions of ultimate value set forth in the 2024 Newmark Appraisal, and with Brycon's estimate that the Property would likely sell for no more than $7,000,000 if it were not sold as a going concern. (12/11/2024 Trial Tr. 19:12-14; Dkt. 508 at 6, ¶¶ 30, 32, 34-35; *see also* Dkt. 509 at 11-12, ¶¶ 69.c, 72, 74).

///

///

---

[8] Mr. Eschmeyer's liquidation valuation does not distinguish between a liquidation sale of the Hotel as a going concern versus a non-operating entity.

### E.    The Attempts to Refinance

The Interest Holders have been attempting to refinance the Debtor's Property, the Fairfield Inn, and/or the Residence Inn since at least 2019. (12/11/2024 Trial Tr. 158:19-24). Those efforts have been unsuccessful or have resulted in financing offers the Interest Holders determined to be unsatisfactory. (12/11/2024 Trial Tr. 158:19-159:7, 159:17-162:5; 12/12/2024 Trial Tr. 15:16-18).

At this time, the Debtor and the Affiliates are relying exclusively on Mr. Leach to pursue their refinancing efforts. (12/11/2024 Trial Tr. 158:7-10, 162:14-16). As of the time of the Confirmation Hearing, the Debtor had not submitted any term sheets from lenders to refinance the Property or either of the Affiliate Properties.[9] There are also no written commitments from the Affiliates to contribute funds to the Debtor or from the Affiliates to contribute funds to the Interest Holders to contribute to the Debtor.

### F.    The Debtor's Performance During This Bankruptcy Case

This case has been pending for approximately four years. During that four-year period, the Debtor has remained in possession and has continued to operate the Hotel as a Holiday Inn Express.

The schedules reflect that the Debtor began this case with approximately $450,000 of cash on hand. (Dkt. 72 at 3-4; Trial Ex. 2 at 3-4). The Debtor had accumulated approximately $1.2 million by the time of the Confirmation Hearing. (12/11/2024 Trial Tr. 151:21-24). The most recent monthly operating report on file reflects that the Debtor had $1,072,239 of cash on hand as of February 28, 2025. (Dkt. 575 at 2).

During a portion of this case, the Debtor has made adequate protection payments to FCB in the approximate amount of $35,000 per month (the "FCB Adequate Protection Payments"),

---

[9] The Debtor filed a non-binding letter of intent from Rok Lending LLC ("Rok") pertaining to the Fairfield Inn after the conclusion of the Confirmation Hearing, which Brycon and FCB ask the Court to disregard as undisclosed, untimely, and unhelpful. (Dkt. 548; Dkt. 552). As discussed herein, the refinance proposed in the Debtor Plan contemplates a refinance of the Debtor's Property. Any potential refinance of the Affiliate Properties is relevant solely to the New Value Contribution proposed in the Debtor Plan. Further, there is no evidence before the Court that any potential Rok loan: (a) could be used as a funding source for the New Value Contribution; or (b) would generate sufficient cash to fund the New Value Contribution.

which payments are less than the monthly interest accrual on FCB's claim. (12/11/2024 Trial Tr. 173:1-10; 12/12/2024 Trial Tr. 131:13-132:2). The Debtor has not made any payments to other secured creditors during the pendency of this case. (12/11/2024 Trial Tr. 173:11-14).

The Debtor proposed a number of prior plans, none of which were pursued. Brycon proposed its original plan in September 2023. The competing plans pending before the Court were filed in March 2024.

**III.** **The Competing Plans**

Generally speaking, the Debtor has proposed a series of alternative restructuring options, which options include a refinance of the Property or, ultimately, a sale of the Property. Brycon has proposed the appointment of a post-confirmation trustee to market and sell all of the Debtor's assets.

**A.** **Summary of the Debtor Plan**

The Debtor proposes to retain and operate the Hotel as a Holiday Inn Express pursuant to the Franchise Agreement, make certain interest-only payments to creditors, refinance the Property within six months of the Effective Date[10] (the "Refinance"), pay certain allowed secured claims in full from the Refinance, and pay all creditors in full within three years. (*See* Dkt. 419; Trial Ex. 14). Interest Holders would continue to manage the Reorganized Debtor, Ledgestone would continue to operate and manage the Property, and the Interest Holders would retain their membership interests in the Reorganized Debtor. (Dkt. 419 at § I; Trial Ex. 14 at § I).

In the event the Refinance does not occur within six months of the Effective Date, the Debtor Plan contemplates continued interest-only payments to creditors and a sale of the Property under the following terms (the "Debtor Sale"):

> [O]ne week following the six-month anniversary of the Effective Date, the Debtor will list the Property for sale with a broker familiar with the subject hospitality market ("Broker"). The total commissions on any sale of the Property will not exceed 6%. On or before twenty (20) weeks after the Debtor's retention of the Broker, the Debtor will enter into a definitive agreement with one or more purchasers for the

---

[10] Absent a stay, the Effective Date of the Debtor Plan would be "[a] business day, selected by the Reorganized Debtor in its discretion, that is at least 14 days after the Confirmation Date." (Dkt. 419 at § II; Trial Ex. 14 at § II).

Debtor's Property and related assets for a purchase price that constitutes the highest and otherwise best offer(s). On or before twenty-four (24) weeks after the Debtor's retention of the Broker, the Debtor will sell the Property to the highest and best bidder. In the event the Debtor, upon consultation with the Broker, determines that additional time is required under the above timeline to maximize the value of the Property, the foregoing timelines may be extended. Any sale of the Property will not include an assignment of the Franchise Agreement to the Buyer without the Franchisor's prior written consent which may be withheld in the Franchisor's sole and exclusive discretion.

The proceeds from the sale of the Property, after payment of commission and ordinary closing costs, will be distributed to Allowed Secured Claims in Classes 2-A, 2-B, 2-C and 2-D in the order of their lien priority in the Property (*i.e.,* first to CIT, then to the City of Tucson, then to Brycon, then to the SBA) until the Allowed Secured Claims in Classes 2-A, 2-B, 2-C and 2-D are paid in full. To the extent that any sale proceeds remain after payment of secured creditors, such sale proceeds will be paid to Allowed Claimants and/or Allowed Interests in the following order of priority: (a) unpaid Allowed Administrative Claims in Class 1-A, on a pro rata basis, until all Allowed Administrative Claims in Class 1-A are paid in full, (b) unpaid Allowed Priority Claims in Class 1-B, on a pro rata basis, until all Allowed Priority Claims in Class 1-B are paid in full; (c) unpaid Allowed Unsecured Claims in Class 3, on a pro rata basis, until all Allowed Unsecured Claims in Class 3 are paid in full with interest at 6% per annum, and (d) to the Interest Holders on a pro rata basis.

(Dkt. 419 at § VII.A; Trial Ex. 14 at § VII.A).

In the event that neither the Refinance nor the Debtor Sale occur, the Debtor Plan provides for an auction (the "Court Auction") on the following terms:

If the Property is not sold (or CIT's and Brycon's Allowed Secured Claims are not otherwise paid in full) within fifteen (15) months following the Confirmation Date, the Debtor's case will be reopened and the Debtor will sell the Property at a Court-supervised auction.

(Dkt. 457 at § III.C; Trial Tr. 22 at § III.C).

/ / /

/ / /

In addition to the proceeds from the proposed Refinance, Debtor Sale, or Court Auction, the Debtor Plan would be funded from cash on hand, Net Revenues[11] generated from the operation of the Property, and a New Value Contribution. (Dkt. 419 at § VII.A; Trial Ex. 14 at § VII.A).

"New Value Contribution" is defined as:

> The contribution of cash in the amount of no less than $100,000 to the Reorganized Debtor by the Interest Holders on the Effective Date, plus any amount contributed by the Interest Holders that may be necessary to pay the PIP Expenses, to the extent that the Retained Net Revenues[12] and/or PIP Financing[13] are insufficient to pay the PIP Expenses.

(Dkt. 419 at § II; Trial Ex. 14 at § II).

/ / /

/ / /

---

[11] "Net Revenues" is defined as:

> The Reorganized Debtor's revenues generated by the operation of the Property less any amounts that are expended by the Reorganized Debtor for the payment of costs and expenses (including TPT taxes, insurance, wages, trade goods and services, franchise fees, lease payments, reserves for real property taxes, and other expenses) relating to the operation, maintenance and preservation of the Property and the Reorganized Debtor's business.

(Dkt. 419 at § II; Trial Ex. 14 at § II).

[12] Under the Debtor Plan, "Retained Net Revenues" means:

> Seventy-five percent of the Net Revenues generated by the Property after payment of (a) debt service to the new lender who provides the refinancing to the Debtor, (b) the SBA Monthly Payments, (c) monthly payments to Johnston and Khan on account of their respective Allowed Secured Claims in Classes 2-E and 2-F . . . , and (f) an amount determined by the Reorganized Debtor to be reasonably necessary to set aside, periodically, as a cash reserve for emergency expenditures and repairs, capital expenditures for the benefit of the Property, and to cover potential periodic cash flow shortfalls, which reserve amount shall not exceed an aggregate of $250,000.

(Dkt. 419 at § II; Trial Ex. 14 at § II).

[13] The Debtor Plan defines "PIP Financing" as:

> The potential financing and/or leasing arrangement by the Reorganized Debtor in connection with the satisfaction of the potential PIP Expenses, which financing may be obtained through, among other potential resources, governmental relief programs such as the Economic Injury Disaster Loan ("EIDL") program administered by the SBA.

(Dkt. 419 at § II; Trial Ex. 14 at § II).

"PIP Expenses" is, in turn, defined as:

> The potential expenses, including labor and material costs, that may be required to improve, upgrade, and/or revise the Property upon the termination of the Franchise Agreement in January 2026 and either (a) the subsequent extension of the Franchise Agreement or (b) the conversion of the Property to another hospitality flag.

(Dkt. 419 at § II; Trial Ex. 14 at § II).

The Debtor Plan anticipates that the New Value Contribution may be as much as $1.8 million. (Dkt. 419 at § VI.D; Trial Ex. 14 at § VI.D). Mr. S. Khangura testified that the Interest Holders anticipate contributing at least $2 million to the Debtor Plan. (Dkt. 508 at 20-21, ¶ 131).

Under the Debtor Plan:

> The New Value Contribution may be used, as the Reorganized Debtor deems necessary and appropriate under the circumstances in its sole discretion, to:
> (a) Pay the amount required to pay all Class 1-A Allowed Administrative Claims, . . . to the extent that there is insufficient Cash-on-Hand to pay such Allowed Claims;
> (b) Pay any Allowed Priority Claims to the extent that there is insufficient Cash-on-Hand to pay such Allowed Claims . . . ;
> (c) Pay the Unsecured Distribution Amount of $75,000 [to general unsecured creditors on the Effective Date];
> (d) Provide reserves for the benefit of the Reorganized Debtor to pay necessary and appropriate capital expenses related to the Property, including funds necessary for major or capital repairs, the acquisition of furniture, fixtures and equipment necessary to maintain and, as necessary, update and upgrade, the Property to ensure that the value of the Property is maintained; and
> (e) Pay for the PIP Expenses, as and if necessary, to the extent that the Retained Net Revenues and/or PIP Financing (if any) are insufficient to pay the PIP Expenses.

(Dkt. 419 at § VI.D; Trial Ex. 14 at § VI.D).

**B.   Summary of the Brycon Plan**

The Brycon Plan provides for the appointment of Mr. Bill Hughes, Managing Director at GlassRatner Advisory and Capital Group, LLC dba B. Riley Advisory Services, to serve as the post-confirmation trustee (the "Post-Confirmation Trustee"). (Dkt. 417 at § 6.2.1).

The Post-Confirmation Trustee's appointment would be effective as of the date the Court enters an order confirming the Brycon Plan, but the Post-Confirmation Trustee would not be vested with any duties under the Brycon Plan until the Effective Date. (Dkt. 417 at §§ 6.2.1, 6.2.3). The Effective Date is generally defined as the first business day after the confirmation order becomes a final order, but which is also conditioned on the confirmation order being "in a form acceptable to the Plan Proponent and the Post-Confirmation Trustee." (Dkt. 417 at §§ 2.43 & 12.1).

Pursuant to the Brycon Plan, as of the Effective Date, the Post-Confirmation Trustee would have the sole authority to, among other things, take possession of, preserve, and maintain the Property; market, liquidate, and/or abandon the Post-Confirmation Assets; retain professionals and non-professionals to assist the Post-Confirmation Trustee; pay the expenses of the Post-Confirmation Estate and the expenses of operating and maintaining the Property, including the Post-Confirmation Trustee's fees and the fees of the professionals and non-professionals he hires; and make distributions pursuant to and otherwise carry out the provisions of the Brycon Plan. (Dkt. 417 at § 6.2.3).

Generally speaking, the Post-Confirmation Trustee would not be responsible for filing the Debtor's tax returns or paying or otherwise setting aside proceeds for the payment of taxes or tax-related liabilities arising from the sale of the Property. (Dkt. 417 at § 6.2.4).

The Post-Confirmation Trustee would be required to "act in a fiduciary capacity on behalf of the interests of all Holders of Claims who will receive Distributions pursuant to the terms of [the Brycon] Plan."[14] (Dkt. 417 at 25, § 6.2.8).

Pursuant to the Brycon Plan and a stipulation between Brycon and FCB (the "Brycon/FCB Stipulation") (Dkt. 417 at Sched. 2), which is incorporated into the Brycon Plan:[15]

> [T]he Post-Confirmation Trustee's use of CIT's cash collateral is conditioned on adherence to certain milestones with respect to the sale of the Property:

---

[14] It is unclear from the Brycon Plan whether the Post-Confirmation Trustee's duty to act as a fiduciary applies to all holders of claims, or only those that will receive distributions.

[15] The Court notes that the stipulation is unsigned. (Dkt. 417 at Sch. 2).

- On or before one (1) weeks after the Confirmation Date, the Post-Confirmation Trustee will retain a broker to which CIT has consented in writing to market and sell the Debtor's Hotel and related assets.

- On or before twelve (12) weeks after the Confirmation Date, the Post-Confirmation Trustee will enter into a definitive agreement with one or more purchasers for the Debtor's Hotel and related assets for a purchase price that constitutes the highest and otherwise best offer(s).

- On or before sixteen (16) weeks after the Confirmation Date, the Closing Date shall occur.

- In the event the Post-Confirmation Trustee determines that additional time is required under the above timeline, he may submit a request to CIT for additional time, as set forth in the [Brycon/CIT] Stipulation.

(Dkt. 417 at § 6.2.5; *see also* Dkt. 417 at Sched. 2, ¶ 6).

The Brycon/FCB Stipulation further provides:

Unless any of the following (each a "Termination Event") is extended or waived (as applicable) with CIT's prior written consent, the authorization granted herein to the Post-Confirmation Trustee to use cash that constitutes CIT's Collateral will automatically terminate upon the <u>earliest</u> of:
a. the Closing Date;
b. the filing of any motion which seeks to grant to a party other than CIT a lien or security interest equal or senior to the liens and security interests held by CIT in the Collateral and any replacement Collateral;
c. the date the Post-Confirmation Trustee ceases to operate the Hotel as a going concern;
d. . . . ;
e. prior to the Closing Date, the Hotel loses its flag with Franchisor;
f. failure to comply with the Milestones; and
g. failure to comply with any other requirement in [the CIT/Brycon Stipulation].

(Dkt. 417, Sched. 2 at ¶ 7).

/ / /

/ / /

Under the Brycon Plan, the Post-Confirmation Trustee's use of cash which constitutes FCB's collateral would also be subject to a budget, which budget has not been disclosed. (Dkt. 417 at Sched. 2, ¶ 2).

The Post-Confirmation Trustee would serve:

> through the earlier of (i) the date that the Post-Confirmation Trustee is discharged by the Bankruptcy Court; and (ii) the date such Post-Confirmation Trustee resigns, is terminated or removed, as provided for in the Confirmation Order, or is otherwise unable to serve, *provided, however,* that in the event that the Post-Confirmation Trustee resigns, is terminated or removed or is unable to serve, then Plan Proponent shall, in consultation with CIT pursuant to the Stipulation [of the parties], select a successor to serve as the Post-Confirmation Trustee, and such successor Post-Confirmation Trustee shall serve in such capacity until such successor Post-Confirmation Trustee is discharged in accordance with [the Brycon] Plan.

(Dkt. 417 at § 6.2.1).

The Brycon Plan contemplates that the Post-Confirmation Trustee would apply to the Court for entry of a final decree and to be discharged from his duties after the Property has been sold and all distributions have been made under the Brycon Plan. (Dkt. 417 at § 6.2.9).

However:

> In the event the Post-Confirmation Trustee is unable to sell the Property as set forth in [the Brycon Plan], or is otherwise unable to consummate the terms of the Plan on or before (i) January 24, 2026, or (ii) the date the Franchise Agreement expires or is terminated, whichever occurs first, he may apply to the Bankruptcy Court for a discharge of his duties under the Plan and request that the Court determine next steps . . . .

(Dkt. 417 at § 6.2.9).

The Post-Confirmation Trustee would be paid "a reasonable hourly rate for his services . . . ."[16] (Dkt. 417 at § 6.2.6). The fees and expenses incurred by the Post-Confirmation Trustee, as well as professionals and non-professional employed by the Post-Confirmation Trustee, would be paid from the collection and sale of the Post-Confirmation Assets, and would be paid from the Post-Confirmation Expense Reserve. (Dkt. 417 at § 6.2.6). The Post-Confirmation Trustee would

---

[16] According to the Brycon Plan, as of March 8, 2024, the Post-Confirmation Trustee's hourly rate was $525.00 per hour. (Dkt. 417 at § 6.2.6). Mr. Hughes did not testify at the Confirmation Hearing.

set the amount of the Post-Confirmation Expense Reserve, and would have the authority to augment the reserve as he deems necessary, in his sole and absolute discretion. (Dkt. 417 at § 2.73).

With respect to distributions to creditors and interest holders, the Brycon Plan provides for the payment of allowed claims, other than general unsecured administrative convenience claims of less than $500, from the proceeds of the Post-Confirmation Assets on the Distribution Date, presumably in a manner consistent with the priority scheme set forth in the Bankruptcy Code. (*See* Dkt. 417 at art. 5). The Distribution Date is defined as the later of the Effective Date, [17] the date upon which a claim becomes allowed, and the first business day to occur fourteen days after the closing of the sale of the Property by the Post-Confirmation Trustee. (Dkt. 417 at §§ 2.29 & 2.42).

### C. Classification of Claims, Treatment of Claims Under Competing Plans, and Votes

The respective plans separately classify and treat the secured claims in this case, include priority and general unsecured classes, and provide for an equity security class consisting of the Interest Holders.

#### a. Allowed Administrative Claims

The administrative claims in this case include professional fees, fees owed to the United States Trustee, a cure payment in the amount of $10,208.42 owed to Hewlett Packard, a cure payment in the amount of $65,000 owed to the Franchisor, and a cure payment in the amount of $3,406.32 owed to Oracle America, Inc ("Oracle"). (Dkt. 417 at § 2.1; Dkt. 419 at § VI.A.1; Trial Ex. 14 at § VI.A.1; Dkt. 436; Dkt. 442). Both plans provide for the payment of allowed administrative claims consistent with § 1129(a)(9) of the Bankruptcy Code,[18] and such claims are therefore unimpaired. (Dkt. 417 at §§ 4.1-4.2; Dkt. 419 at § VI.A.1; Trial Ex. 14 at § VI.A.1). There was, however, no evidence presented as to what the allowed administrative expenses, and in particular the professional fees, are expected to total as of either plan's effective date.

---

[17] See *supra* p. 13; Dkt. 417 at § 2.43.

[18] Unless otherwise indicated, statutory references are to the Bankruptcy Code, Title 11 of the United States Code.

### b. Allowed Priority Tax Claims

The Debtor Plan proposes to pay allowed priority tax claims in full on the Effective Date with interest at the applicable statutory rate. (Dkt. 419 at § VI.A.2; Trial Ex. 14 at § VI.A.2). In the event the Debtor lacks sufficient cash on hand to pay allowed priority tax claims on the Effective Date, any unpaid amounts would continue to accrue interest and the claims would be paid in quarterly installments over a period of three years from the Effective Date. (Dkt. 419 at § VI.A.2; Trial Ex. 14 at § VI.A.2). In the event the Property is sold, any unpaid allowed priority tax claims would be paid after payment of claims of higher priority. (Dkt. 419 at § VI.A.2; Trial Ex. 14 at § VI.A.2).

Under the Brycon Plan, allowed priority tax claims would be paid in full from the proceeds of the Post-Confirmation Assets on the Distribution Date, or as soon thereafter as practicable, presumably to the extent there are sufficient funds on hand to pay such claims in full.[19] (Dkt. 417 at §§ 5.9.2-5.9.3).

As discussed above, the only priority tax claim in this case is the ADOR Priority Claim. The ADOR did not cast a vote for or against either plan.[20] (Dkt. 440 at 6; Trial Ex. 20 at 6; Dkt. 441 at 2; Trial Ex. 21 at 2).

### c. Allowed Secured Claim of FCB

Under the Debtor Plan: (a) the Debtor would continue to make adequate protection payments to FCB through the Confirmation Date, pursuant to the cash collateral orders entered in this case; and (b) beginning on the first business day of the first month following the Effective Date, and continuing until the earlier of the time the claim is paid in full, the time the Property is sold and the proceeds are distributed pursuant to the Debtor Plan, and the time the FCB loan, as modified by the Debtor Plan, is terminated pursuant to its terms, the Debtor would make monthly interest-only payments to FCB based upon the amount of FCB's allowed secured claim and

---

[19] The Brycon Plan contemplates that there may be deficiency claims in the event there are insufficient net proceeds to pay a secured creditor's claim in full, but does not appear to contemplate that priority tax claims would be paid anything less than in full. (*See* Dkt. 417 at §§ 2.37; 5.9).

[20] Although the Debtor's ballot report asserts that the ADOR is impaired, did not vote, and is deemed to reject the Debtor Plan (Dkt. 441), it would appear that the ADOR is deemed to accept the Debtor Plan given the stipulation on file, which appears to the Court to have been fully incorporated into the Debtor Plan. (*See* Dkt. 179).

interest at the rate of 8.5% per annum (the "FCB Monthly Payments"). (Dkt. 419 at § VI.B.1; Trial Ex. 14 at § VI.B.1; Dkt. 457 at §§ III.A-B; Trial Ex. 22 at §§ III.A-B). The balance of FCB's allowed secured claim would be paid from the Refinance, Debtor Sale, or Court Auction of the Property, after payment of commissions and ordinary closing costs. (Dkt. 419 at § VI.B.1; Trial Ex. 14 at § VI.B.1). FCB would retain its lien until such time as FCB's allowed secured claim is paid in full. (Dkt. 419 at § VI.B.1.f; Trial Ex. 14 at § VI.B.1.f).

Under the Brycon Plan, FCB would receive monthly payments of $74,386.46 until the sale of the Property, and the balance of FCB's allowed claim would be paid[21] from the proceeds of the Post-Confirmation Assets on the Distribution Date, or as soon thereafter as practicable. (Dkt. 417 at § 5.1 & Sched. 2).

FCB voted to reject the Debtor Plan and accept the Brycon Plan. (Dkt. 441 at 2-3; Trial Ex. 21 at 2-3; Dkt. 440 at 5; Trial Ex. 20 at 5).

d.  <u>Allowed Secured Claim of the City</u>

Under the Debtor Plan: (a) beginning on the first business day of the first month following the Effective Date, and for a period of six months following the Effective Date, the Debtor would make interest-only payments to the City based upon the amount of the City's allowed secured claim and interest at the rate of 6% per annum (the "City Monthly Payments"); (b) the Debtor would continue to make the City Monthly Payments on a monthly basis thereafter until the earlier of the first business day of the sixth month following the Effective Date, or such time as the City's allowed secured claim is paid in full; and (c) in the event the Debtor's proposed refinancing does not occur, the City's allowed secured claim would be paid from the proceeds of the Debtor Sale or Court Auction, after payment of commissions, ordinary closing costs, and the payment of CIT's allowed secured claim. (Dkt. 419 at § VI.B.2; Trial Ex. 14 at § VI.B.2). The City would retain its lien until such time as the City's allowed secured claim is paid in full. (Dkt. 419 at § VI.B.2.e; Trial Ex. 14 at § VI.B.2.e).

---

[21] The classification and treatment section of the Brycon Plan provides for full payment of FCB's allowed claim, but the Brycon Plan does not guarantee full payment. (*See* Dkt. 417 at §§ 2.37, 5.1, 5.11, 6.2.5; *see also* 12/11/2024 Trial Tr. 54:17-55:15).

Under the Brycon Plan, the City's allowed claim, which Brycon has agreed would include post-petition interest, costs, and fees, as provided under § 506(b), to the extent applicable, would be paid[22] from the proceeds of the Post-Confirmation Assets on the Distribution Date, or as soon thereafter as practicable. (Dkt. 417 at § 5.2; Dkt. 430 at 2).

The City did not cast a vote for or against the Debtor Plan, and is therefore deemed to reject the Debtor Plan. (Dkt. 441 at 3; Trial Ex. 21 at 3). The City voted to accept the Brycon Plan. (Dkt. 440 at 5; Trial Ex. 20 at 5).

e.    Allowed Secured Claim of Brycon

Under the Debtor Plan, beginning on the first business day of the first month following the Effective Date, and continuing until the earlier of the time the claim is paid in full and the time the Property is sold and the proceeds distributed pursuant to the Debtor Plan, the Debtor would make monthly interest-only payments to Brycon based upon the amount of Brycon's allowed secured claim with interest at the rate of 8.5% per annum (the "Brycon Monthly Payments"). (Dkt. 419 at § VI.B.3; Trial Ex. 14 at § VI.B.3; Dkt. 457 at §§ III.A-B; Trial Ex. 22 at §§ III.A-B). The balance of Brycon's allowed secured claim would be paid from the Refinance or Debtor Sale or Court Auction of the Property, after payment of commissions, closing costs, and the payment of FCB's and the City's allowed secured claims. (Dkt. 419 at § VI.B.3; Trial Ex. 14 at § VI.B.3; Dkt. 457 at §§ III.A-B; Trial Ex. 22 at §§ III.A-B). Brycon would retain its lien until such time as Brycon's allowed secured claim is paid in full. (Dkt. 419 at § VI.B.3.e; Trial Ex. 14 at § VI.B.3.e).

Under the Brycon Plan, Brycon's allowed claim would be paid[23] from the proceeds of the Post-Confirmation Assets on the Distribution Date, or as soon thereafter as practicable. (Dkt. 417 at § 5.3).

---

[22] The classification and treatment section of the Brycon Plan provides for full payment of the City's allowed claim, but the Brycon Plan does not guarantee full payment. (*See* Dkt. 417 at §§ 2.37, 5.2, 5.11, 6.2.5; *see also* 12/11/2024 Trial Tr. 54:17-55:15).

[23] The classification and treatment section of the Brycon Plan provides for full payment of Brycon's allowed claim, but the Brycon Plan does not guarantee full payment. (*See* Dkt. 417 at §§ 2.37, 5.3, 5.11, 6.2.5; *see also* 12/11/2024 Trial Tr. 54:17-55:15).

Brycon voted to reject the Debtor Plan and accept its own plan. (Dkt. 441 at 3; Trial Ex. 21 at 3; Dkt. 440 at 5; Trial Ex. 20 at 5).

f. <u>Secured Claim of the SBA</u>

The SBA has asserted a claim in the amount of $518,082.19 arising from an Economic Injury Disaster Loan (the "EIDL Loan") secured by certain personal property of the Debtor. (Proof of Claim 2-1). The Debtor has represented that as of the Petition Date, it had not spent all of the proceeds of the EIDL Loan, and was holding $289,720 of such funds (the "Remaining SBA Loan Funds"). (Dkt. 419 at § VI.B.4; Trial Ex. 14 at § VI.B.4). The Debtor takes the position that given the value of its personal property and given the liens of higher priority, the SBA's claim is secured solely by the Remaining SBA Loan Funds. The Debtor Plan proposes to give SBA an allowed secured claim in the amount of $289,720, with the remaining balance of its claim treated as unsecured in Class 3. (Dkt. 419 at § VI.B.4; Trial Ex. 14 at § VI.B.4).

Under the Debtor Plan, the SBA's allowed secured claim would accrue interest at the rate of 3.75%, consistent with the EIDL Loan documents. (Dkt. 419 at § VI.B.4; Trial Ex. 14 at § VI.B.4). The Debtor would make monthly payments of principal and interest, based on a 30-year amortization and interest at 3.75%, beginning on the first business day of the first month following the Effective Date until the SBA's allowed secured claim is paid in full. (Dkt. 419 at § VI.B.4; Trial Ex. 14 at § VI.B.4). If the Debtor obtains the Refinance, the Debtor would pay any remaining balance due on account of the SBA's allowed secured claim no later than the first day of the thirty-sixth month following the Effective Date. (Dkt. 419 at § VI.B.4; Trial Ex. 14 at § VI.B.4). In the event the Refinance does not occur, the SBA's allowed secured claim would be paid from the proceeds of the Debtor Sale or Court Auction, after payment of commissions, ordinary closing costs, and allowed secured claims of higher priority. (Dkt. 419 at § VI.B.4; Trial Ex. 14 at § VI.B.4).

/ / /

/ / /

Under the Brycon Plan, the SBA's allowed claim would be paid[24] from the proceeds of the Post-Confirmation Assets on the Distribution Date, or as soon thereafter as practicable. (Dkt. 417 at § 5.4).

The SBA did not cast a vote and is therefore deemed to reject both plans. (Dkt. 441 at 3; Trial Ex. 21 at 3; Dkt. 440 at 5; Trial Ex. 20 at 5).

g.     Allowed Secured Claim of Kevin Johnston

Mr. Johnston has a claim in the principal amount of $8,175.80 secured by certain personal property (the "Johnston Collateral"). Under the Debtor Plan, Mr. Johnston's claim would be allowed as a fully secured claim. (Dkt. 419 at § VI.B.5; Trial Ex. 14 at § VI.B.5). The claim would be paid in equal monthly payments of principal and interest at the rate of 4.25% per annum over a period of three years from the Effective Date. (Dkt. 419 at § VI.B.5; Trial Ex. 14 at § VI.B.5). In the event the Property is sold, the Debtor would surrender the Johnston Collateral to Mr. Johnston in full satisfaction of his allowed secured claim. (Dkt. 419 at § VI.B.5; Trial Ex. 14 at § VI.B.5).

Under the Brycon Plan, Mr. Johnston's allowed claim would be paid[25] from the proceeds of the Post-Confirmation Assets on the Distribution Date, or as soon thereafter as practicable. (Dkt. 417 at § 5.5).

Mr. Johnston voted to accept the Debtor Plan and reject the Brycon Plan. (Dkt. 441 at 3-4; Trial Ex. 21 at 3-4; Dkt. 440 at 5; Trial Ex. 20 at 5).

h.     Allowed Secured Claim of Mohammed Rayhan Khan

Mr. Khan has a claim in the principal amount of $9,887.40 secured by certain personal property (the "Khan Collateral"). Under the Debtor Plan, Mr. Khan's claim would be allowed as a fully secured claim. (Dkt. 419 at § VI.B.6; Trial Ex. 14 at § VI.B.6). The claim would be paid in equal monthly payments of principal and interest at the rate of 4.25% per annum over a period

---

[24] The classification and treatment section of the Brycon Plan provides for full payment of the SBA's allowed claim, but the Brycon Plan does not guarantee full payment. (*See* Dkt. 417 at §§ 2.37, 5.4,5.11, 6.2.5; *see also* 12/11/2024 Trial Tr. 54:17-55:15).

[25] The classification and treatment section of the Brycon Plan provides for full payment of Mr. Johnston's allowed claim, but the Brycon Plan does not guarantee full payment. (*See* Dkt. 417 at §§ 2.37, 5.5, 5.11, 6.2.5; *see also* 12/11/2024 Trial Tr. 54:17-55:15).

of three years from the Effective Date. (Dkt. 419 at § VI.B.6; Trial Ex. 14 at § VI.B.6). In the event the Property is sold, the Debtor would surrender the Khan Collateral to Mr. Khan in full satisfaction of his allowed secured claim. (Dkt. 419 at § VI.B.6; Trial Ex. 14 at § VI.B.6).

Under the Brycon Plan, Mr. Khan's allowed claim would be paid[26] from the proceeds of the Post-Confirmation Assets on the Distribution Date, or as soon thereafter as practicable. (Dkt. 417 at § 5.6).

Mr. Khan voted to accept the Debtor Plan and reject the Brycon Plan. (Dkt. 441 at 4; Trial Ex. 21 at 4; Dkt. 440 at 6; Trial Ex. 20 at 6).

### i. Allowed Secured Claim of Canyon Bank

Canyon asserts a claim in the amount of $8,681.20 representing attorney's fees and costs incurred in connection with a PPP loan issued to the Debtor, which claim Canyon asserts is secured by the Property and entitled to priority under § 507(a)(9). Under the Debtor Plan, the claim asserted by Canyon would be paid in full on the Effective Date, as a secured claim. (Dkt. 419 at § VI.B.7; Trial Ex. 14 at § VI.B.7).

Under the Brycon Plan, Canyon's allowed claim would be paid[27] from the proceeds of the Post-Confirmation Assets on the Distribution Date, or as soon thereafter as practicable.[28] (Dkt. 417 at § 5.8).

Canyon voted to accept the Debtor Plan and reject the Brycon Plan. (Dkt. 441 at 4; Trial Ex. 21 at 4; Dkt. 440 at 6; Trial Ex. 20 at 6).

### j. Allowed General Unsecured and Deficiency Claims

Under the Debtor Plan:

> (a) First, Allowed Unsecured Claims will share, *pro rata* in a distribution of the sum of $75,000 in cash (the "Unsecured

---

[26] The classification and treatment section of the Brycon Plan provides for full payment of Mr. Khan's allowed claim, but the Brycon Plan does not guarantee full payment. (*See* Dkt. 417 at §§ 2.37, 5.6, 5.11, 6.2.5; *see also* 12/11/2024 Trial Tr. 54:17-55:15).

[27] The classification and treatment section of the Brycon Plan provides for full payment of Canyon's allowed claim, but the Brycon Plan does not guarantee full payment. (*See* Dkt. 417 at §§ 2.37, 5.8, 5.11, 6.2.5; *see also* 12/11/2024 Trial Tr. 54:17-55:15).

[28] The Brycon Plan does not specify whether it is treating the Canyon claim as a secured claim or a priority claim. (*See* Dkt. 417 at §§ 2.19, 3.2.9, 5.8).

Distribution Amount") paid by the Reorganized Debtor from the New Value Contribution on the Effective Date.

(b) Allowed Unsecured Claims will accrue interest at the rate of 6% per annum until they are paid in full as provided in the Plan.

(c) Second, each quarter following the Effective Date until all Allowed Unsecured Claims are paid in full, the Reorganized Debtor will make interest only payments to Class 3 Claimants, based on the amount of each respective Allowed Unsecured Claim, at the rate of 6% per annum (the "Interest Payments").

(d) Third, Allowed Unsecured Claims will share, *pro rata*, in a total of two (2) annual distributions of 25% of the Reorganized Debtor's Net Revenues from the operations of the Property ***after*** payment of (a) debt service to the new lender who provides the refinancing to the Debtor, (b) the SBA Monthly Payments, (c) monthly payments to Johnston and Khan on account of their respective Allowed Secured Claims . . ., and (f) an amount determined by the Reorganized Debtor to be reasonably necessary to set aside, periodically, as a cash reserve for emergency expenditures and repairs, capital expenditures for the benefit of the Property, and to cover potential periodic cash flow shortfalls, which reserve amount shall not exceed an aggregate of $250,000 (*i.e.,* the Annual Percentage Distributions). The Annual Percentage Distributions will be made on each anniversary of the Effective Date for two consecutive years and will be applied to the principal amount of the Allowed Unsecured Claims.

(e) Fourth, on or before the first day of the 36th month following the Effective Date, the Reorganized Debtor will pay any remaining balance due on Allowed Unsecured Claims (the "Unsecured Payoff Payments").

. . . .

In the event that the refinancing does not occur as contemplated in the Plan and the Property is sold, then Allowed Unsecured Claims will be paid from the proceeds of the sale of the Property, after payment of commissions, ordinary closing costs, [and the payment of all allowed claims of higher priority in full].

(Dkt. 419 at § VI.C; Trial Ex. 14 at § VI.C).

Under the Brycon Plan, there is a general unsecured class (the "Brycon General Unsecured Class") and an administrative convenience class (the "Brycon Administrative Convenience Class"). (Dkt. 417 at §§ 3.2.11, 3.2.13). The Brycon Administrative Convenience Class consists

of allowed general unsecured and deficiency claims of $500 or less, the holders of which have not elected to be treated as part of the Brycon General Unsecured Class (the "Administrative Convenience Claims"). (Dkt. 417 at § 3.2.13).

Brycon proposes to pay holders of Administrative Convenience Claims fifty percent of the allowed amount of their claims in cash on the Effective Date, or as soon thereafter as practicable. (Dkt. 417 at § 5.12).

Creditors with allowed general unsecured and deficiency claims in amounts that exceed the Administrative Convenience Claims debt cap and creditors with Administrative Convenience Claims who have elected to be treated as Brycon General Unsecured Class creditors would "be paid [their] pro rata portion out of all General Unsecured Claims up to 100% of the Allowed Amount of [each creditor's respective] General Unsecured Claim on the Distribution Date, or as soon thereafter as practicable." (Dkt. 417 at §§ 5.10-5.11).

As discussed above, the general unsecured and deficiency claims in this case are estimated to total approximately $850,000. General unsecured creditors voted to accept the Debtor Plan. (Dkt. 441 at 4; Trial Ex. 21 at 4). Brycon received no votes from general unsecured creditors, and the unsecured creditor classes are therefore deemed to reject the Brycon Plan. (Dkt. 440 at 6; Trial Ex. 20 at 6).

### k. Equity Interests

Under the Debtor Plan, the Interest Holders would retain their pre-petition equity interests in the Debtor. (Dkt. 419 at § VI.D; Trial Ex. 14 at § VI.D). In exchange, the Interest Holders would contribute the New Value Contribution to the Debtor, at least $100,000 of which would be paid to the Debtor on or before the Effective Date of the Debtor Plan. (Dkt. 419 at § VI.D; Trial Ex. 14 at § VI.D).

Under the Brycon Plan, Interest Holders would receive distributions "only if and to the extent all Administrative Claims, Classes 1 through 12, and any and all expenses and fees of the Post-Confirmation Trustee and/or his Professionals are paid in full." (Dkt. 417 at § 5.13). "In such instance, Holders of Class 13 Equity Interests [would] be paid pro rata based on the amount of each respective Equity Interest." (Dkt. 417 at § 5.13).

Interest Holders voted to accept the Debtor Plan and reject the Brycon Plan. (Dkt. 441 at 5; Trial Ex. 21 at 5; Dkt. 440 at 6; Trial Ex. 20 at 6).

**D. Other Plan Terms**

a. <u>Executory Contracts and Unexpired Leases</u>

The Debtor proposes to assume the Ledgestone Management Agreement, a personal property lease with Hewlett Packard (the "Hewlett Packard Lease"), the Franchise Agreement and any ancillary contracts related thereto, and the other unexpired leases and executory contracts set forth on Schedule G,[29] including an executory contract with Oracle (the "Oracle Contract"). (Dkt. 419 at § XVI; Trial Ex. 14 at § XVI; Dkt. 444). The Debtor would be required to tender a cure payment in the amount of $65,000 to the Franchisor in order to assume the Franchise Agreement, a cure payment in the amount of $10,208.41 to Hewlett Packard in order to assume the Hewlett Packard Lease, and a cure payment in the amount of $3,406.32 to Oracle in order to assume the Oracle Contract. (*See* Dkt. 419 at § XII.A.1; Trial Ex. 14 at § XII.A.1; Dkt. 444).

The Brycon Plan similarly provides for assumption of the Ledgestone Management Agreement,[30] the Franchise Agreement, the Hewlett Packard Lease, and the Oracle Lease. (Dkt. 417 at §§ 7.1, 7.1.1, 7.2, Sched. 1.1-1.2; Dkt. 445). Brycon proposes the same $65,000 cure payment to the Franchisor, the same $3,406.32 cure payment to Oracle, and a to-be-determined cure payment to Hewlett Packard. (Dkt. 417 at §§ 7.1, 7.1.1, Sched. 1.1, Sched. 1.2; Dkt. 445). Despite the foregoing, the Brycon Plan also includes a provision which would give the Post-Confirmation Trustee the ability to "file a notice with the Bankruptcy Court after the Confirmation Date, but before the Closing Date, rejecting a previously Assumed Executory Contract or Assumed Unexpired Real & Personal Property Lease." (the "Rejection Provision") (Dkt. 417 at § 7.4).

/ / /

/ / /

---

[29] See Dkt. 72 at 44-47; Trial Ex. 2 at 44-47.

[30] Mr. Harris has indicated that Ledgestone would terminate the Ledgestone Management Agreement if allowed to do so under the terms of the agreement. (12/12/2024 Trial Tr. 126:7-10).

b.    Post-Confirmation Management and Compensation

Under the Debtor Plan, Mr. S. Khangura and Mr. J. Khangura would each be paid $3,000 per month for providing various post-confirmation services to the Debtor.[31] (Dkt. 419 at § VII.B; Trial Ex. 14 at § VII.B). Mr. S. Khangura would continue to manage the Debtor post-confirmation. (Dkt. 419 at § VII.D; Trial Ex. 14 at § VII.D).

As discussed in the plan summary section above, under the Brycon Plan, the Post-Confirmation Trustee would take control of the Debtor and be paid "a reasonable hourly fee," presumably the Post-Confirmation Trustee's normal hourly rate, for services rendered. (Dkt. 417 at § 6.2). The Post-Confirmation Trustee would have full discretion to hire additional professionals. (Dkt. 417 at § 6.2.3). There is no oversight mechanism built into the Brycon Plan or monetary cap on the fees that could be paid to the Post-Confirmation Trustee and/or any of the individuals or entities he might employ or retain. (*See* Dkt. 417 at § 6.2).

c.    Discharge Provisions

Under the Debtor Plan, the Debtor would receive a discharge upon confirmation, which discharge would be effective as of the Effective Date (the "Debtor Plan Discharge Provision"). (Dkt. 419 at § VIII; Trial Ex. 14 at § VIII).

The Brycon Plan acknowledges that pursuant to § 1141(d)(3), because the plan is a liquidating plan, confirmation would not discharge claims against the Debtor. (Dkt. 417 at § 8.2).

**IV.   The Plan Objections**

FCB and Brycon have filed objections to confirmation of the Debtor Plan. (Dkt. 432; Trial Exhibit 16; Dkt. 433; Trial Ex. 17; Dkt. 472; Trial Ex. 23; Dkt. 473; Trial Ex. 24). The Debtor, Mr. S. Khangura, and Ms. R. Khangura have filed objections to confirmation of the Brycon Plan. (Dkt. 434; Trial Ex. 18; Dkt. 435; Trial Ex. 19).

---

[31] Such services include supervising the operation of the Property; reviewing and entering into contracts; raising, allocating, and expending funds on capital improvements; acquiring furniture, fixtures, and equipment for the Property; incurring and paying debts outside the ordinary course; reviewing and approving budgets and business plans; retaining professionals; reviewing and approving tax returns; making decisions pertaining to claims held by or asserted against the Debtor; reviewing and approving bankruptcy-related forms; and ensuring compliance with the Debtor Plan. (Dkt. 419 at § VII.B; Trial Ex. 14 at § VII.B).

### A.   Objections to the Debtor Plan

FCB argues that the Debtor Plan cannot be confirmed because: (a) the Debtor Plan was not proposed in good faith, as required by § 1129(a)(3); (b) the Debtor Plan fails to satisfy the feasibility requirements of § 1129(a)(11); (c) the Debtor Plan proposes an interest rate that fails to satisfy the requirements of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), rendering the plan not fair and equitable within the meaning of § 1129(b); and (d) the Debtor Plan otherwise fails to satisfy § 1129(b)(2)'s fair and equitable standard because it unfairly shifts the risk of the plan's failure to FCB. [32]

Brycon argues that the Debtor Plan cannot be confirmed on the basis that: (a) the Debtor Plan violates § 1129(a)(1) because the Debtor Plan fails to provide an adequate means for the plan's implementation as required by § 1123(a)(5); (b) the Debtor has proposed a hollow refinancing, has undervalued its Property in an attempt to underpay creditors, and favors insiders given the proposed post-confirmation payments to insiders, and the Debtor Plan was therefore not filed in good faith as required by § 1129(a)(3); (c) the Debtor Plan fails to satisfy the best interest of creditors test set forth in § 1129(a)(7); (d) the Debtor Plan is not feasible within the meaning of § 1129(a)(11); and (e) the Debtor Plan does not satisfy the provisions of § 1129(b) because it is not fair and equitable and does not propose to pay Brycon the present value of its secured claim.[33]

### B.   Objections to the Brycon Plan

The Debtor argues that the Brycon Plan provides for the forced liquidation of the Property to the detriment of all creditors, other than FCB, and to the detriment of the Interest Holders. The Debtor argues that the Brycon Plan: (a) does not comply with the executory contract provisions of § 365(d)(2) and therefore fails to comply with § 1129(a)(1); (b) was not proposed in good faith because it would not achieve a result consistent with the objectives and purposes of the Code, as

---

[32] In addition to the foregoing objections, FCB originally objected to language in the Debtor Plan pertaining to the allowable amounts of FCB's claim. (Dkt. 432 at § II.C; Trial Ex. 16 at § II.C). That objection appears to have been resolved by modifications the Debtor made to its plan, and was not addressed by the parties during the Confirmation Hearing. (*See* Dkt. 457 at § III.D; Dkt. 472 at § I.B.6; Trial Ex. 23 at § I.B.6).

[33] Brycon has also joined in certain of FCB's plan objections. (Dkt. 473).

required by § 1129(a)(3); and (c) is not fair and equitable within the meaning of § 1129(b) because it does not provide for the Interest Holders to recover the value of their interests.[34]

Mr. S. Khangura and Ms. R. Khangura argue that there is significant value in their equity interests, which they would not recover under the Brycon Plan. They therefore argue that the Brycon Plan is not fair and equitable to Interest Holders. The Khanguras also argue that the Brycon Plan may unfairly generate tax liability for the Interest Holders.

## V.    **Legal Analysis and Conclusions of Law**

The requirements for confirmation of a Chapter 11 plan are set forth in § 1129 of the Bankruptcy Code. If all the provisions of § 1129(a) are satisfied with the exception of § 1129(a)(8), a plan can nevertheless be confirmed if the plan satisfies the provisions of § 1129(b). In this case, neither plan satisfies § 1129(a)(8) because each plan has at least one impaired, non-accepting class. (Dkt. 440; Trial Ex. 20; Dkt. 441; Trial Ex. 21). Therefore, in order for the Court to consider confirmation of either plan, the cramdown provisions of § 1129(b) must be satisfied.[35]

The plan proponent bears the burden of establishing that its plan satisfies the requirements for confirmation by a preponderance of the evidence. *Liberty Nat'l Enters v. Ambanc La Mesa P'Ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997), *cert. denied,* 522 U.S. 1110 (1998); *United States ex rel. Farmers Home Admin. v. Arnold & Baker Farms (In re Arnold and Baker Farms)*, 177 B.R. 648, 654-55 (9th Cir. BAP 1994), *aff'd*, 85 F.3d 1415 (9th Cir. 1996). The Court may only confirm one plan. 11 U.S.C. § 1129(c).

### A.    **The Debtor Plan**

As discussed above, FCB and Brycon argue that the Debtor Plan: (a) violates § 1129(a)(1) because the Debtor Plan fails to provide an adequate means for the plan's implementation as required by § 1123(a)(5); (b) was not proposed in good faith as required by § 1129(a)(3); (c) fails

---

[34] The Debtor also raised a § 1129(a)(5) objection for the first time in its post-trial brief. (Dkt. 553).

[35] Although Mr. Freis testified that it was his lay witness understanding that the Brycon Plan satisfies § 1129(a)(8) "because all claimants will either be paid in full or have accepted the Brycon Plan" (Dkt. 507 at 5, ¶ 20.g), Brycon's counsel has acknowledged that there are impaired classes that have not accepted the Brycon Plan, and the Brycon Plan can therefore only be confirmed if it satisfies § 1129(b). (Dkt. 440; Trial Ex. 20).

to satisfy the best interest of creditors test set forth in § 1129(a)(7); (d) is not feasible as required by § 1129(a)(11); and (e) fails to satisfy the requirements of § 1129(b).

## 1. Section 1129(a)(1)

Pursuant to § 1129(a)(1), a plan can only be confirmed if it complies with the applicable provisions of the Bankruptcy Code. Brycon argues that the Debtor Plan violates § 1129(a)(1) because it fails to provide adequate means for the plan's implementation as required by § 1123(a)(5).

Brycon's § 1123(a)(5) objection is consumed within Brycon's § 1129(a)(11) feasibility objection,[36] and will therefore be addressed in the Court's § 1129(a)(11) analysis below. That being said, the Court notes that the Debtor Plan Discharge Provision is inconsistent with § 1141(d)(3) and would need to be modified given that the Debtor Plan contemplates a possible liquidation in the form of a Debtor Sale or Court Auction of the Property. Therefore, the Debtor Plan, as proposed, does not comply with § 1129(a)(1).

## 2. Section 1129(a)(3)

Pursuant to § 1129(a)(3), a plan can only be confirmed if it "has been proposed in good faith and not by any means forbidden by law."

FCB argues that the Debtor Plan has not been proposed in good faith because, more than three years into this case, the Debtor has proposed a vague and speculative plan that gives the Debtor significant leeway to the detriment of secured creditors, is premised on funding sources that are unsupported by evidence, and impermissibly shifts the risk of a default onto creditors.

Brycon similarly argues that the Debtor has allowed this case to languish for years, promises a refinancing that is not supported by evidence, has proposed a plan that impermissibly favors the interests of insiders over creditors, and that the Debtor Plan is therefore not proposed in good faith.

In the Ninth Circuit, the Court need only look to the circumstances surrounding the proposal of the plan, and the Court need not look to the terms of the plan itself. *Garvin v. Cook Investments NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019) (concluding that

---

[36] *See* Dkt. 433 at § IV.B.1; Trial Ex. 17 at § IV.B.1; Dkt. 551 at § III.A.2.

"§ 1129(a)(3) directs courts to look only to the proposal of a plan, not the terms of the plan"); *In re Juarez*, 836 Fed. App'x 557, 560 (9th Cir. 2020) ("The focus under § 1129(a)(3) is limited to 'the manner of the plan's *proposal*,' not on a debtor's allegedly bad faith activities unrelated to plan proposal, because § 1129(a)(3) does not require that a plan 'comply with all applicable law.'"); *Legal Serv. Bureau, Inc. v. Orange Cnty. Bail Bonds, Inc. (In re Orange Cnty. Bail Bonds, Inc.)*, 638 B.R. 137, 147 (9th Cir. BAP 2022) ("Section 1129(a)(3) directs courts to look only to the proposal of a plan, not its terms."). "A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code." *In re Orange Cnty. Bail Bonds, Inc.*, 638 B.R. at 147 (quoting *Platinum Cap. Inc. v. Sylmar Plaza L.P. (In re Sylmar Plaza, L.P.)*, 314 F. 3d 1070, 1047 (9th Cir. 2002)).[37]

In this case, Mr. S. Khangura has testified that the Debtor Plan was proposed in good faith and not by any means forbidden by law, and that the Debtor Plan is the product of a legitimate and honest attempt to reorganize. (Dkt. 508 at 26, ¶¶ 167-68). The Debtor Plan contemplates a refinance of the Property, and in the event that a refinance does not occur, a sale of the Property, either by the Debtor or at a Court auction. The Debtor Plan proposes to allow the Debtor an opportunity to try to reorganize if the Debtor is able to pay all allowed claims in full, which is consistent with the objectives of Chapter 11, and the Debtor Plan provides for a liquidation in the event the Debtor is unable to reorganize, which liquidation would generate proceeds that would be used to pay creditors pursuant to the priority scheme in the Code.

Although the terms of the Debtor Plan contain ambiguities and deficiencies, which are discussed in more detail herein, the Court finds Mr. S. Khangura's testimony pertaining to the proposal of the Debtor Plan to be credible. Given the narrow scope of § 1129(a)(3), the Court finds that the Debtor Plan has been proposed in good faith and not by any means forbidden by law, and that the Debtor Plan therefore satisfies the requirements of § 1129(a)(3).

/ / /

/ / /

---

[37] None of the parties cite to *Garvin v. Cook Investments NW, SPNWY, LLC*, 922 F.3d 1031 (9th Cir. 2019) or its progeny in their filings with the Court.

### 3.    Section 1129(a)(7)

Section 1129(a)(7)(A) requires that each holder of a claim or interest in an impaired class either accept the plan or receive or retain under the plan at least as much as the holder of such claim would receive in a Chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(A); *In re Bashas' Inc.*, 437 B.R. 874, 914 (Bankr. D. Ariz. 2010).

Brycon argues that the Debtor has failed to meet its burden of establishing that the Debtor Plan will provide better treatment to creditors than they would receive through a liquidation under Chapter 7. Brycon contends that, given the value of the Property, all allowed claims would promptly be paid in full under a Chapter 7 liquidation. Brycon argues that under the Debtor Plan, creditors would be forced to impermissibly endure further delays and uncertainties.

The Debtor asserts that, based upon Brycon's own appraisal, the liquidation value of the Debtor's Property is no greater than $7.8 million, and, therefore, under a liquidation scenario, the only creditor that would recover any amount on account of its allowed claim in this case is FCB. (Dkt. 508 at 28-29, ¶¶ 176-177). Given this, the Debtor suggests that the Refinance, Debtor Sale, and/or Court Auction would provide creditors with a return at least equal to what they would receive in a Chapter 7 liquidation.

In order to determine whether a plan satisfies § 1129(a)(7)(A), courts must determine what creditors and interest holders would receive under a hypothetical liquidation, and compare that hypothetical liquidation return with what creditors and interest holders would receive under the proposed plan. *Schoenmann v. Bank of the West (In re Tenderloin Health)*, 849 F.3d 1231, 1237 (9th Cir. 2017). To satisfy § 1129(a)(7)(A), the Debtor must show that every holder of a claim or interest in an impaired class that has voted to reject the Debtor Plan will receive or retain at least as much as it would receive if the Debtor were liquidated under Chapter 7. 11 U.S.C. § 1129(a)(7)(A); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 657.

The Debtor Plan proposes to allow the Debtor a period of time to attempt to refinance the Property, a period of time to allow the Debtor an opportunity to try to sell the Property, and as a last resort, a sale of the Property at a Court auction.

As a preliminary matter, the Court does not find Brycon's argument that all allowed claims would promptly be paid in full under a Chapter 7 liquidation to be supported by the evidence. Brycon's valuation expert, Mr. Eschmeyer, opined in the 2024 Newmark Appraisal that the liquidation value of the Property is $7,800,000, which recovery would be insufficient to pay the claim of even the first-position lienholder, FCB, in full. That being said, in the event that the Refinance and/or Debtor Sale do not materialize, the Debtor Plan proposes a liquidation sale of the Property in the form of the Court Auction. Such auction would not occur until at least fifteen months after the Effective Date of the Debtor Plan. As proposed, such Court Auction is not subject to a minimum purchase price or any formal procedures. Insiders Mr. S. Khangura and Mr. J. Khangura would receive monthly salaries in the interim period, and the actions taken by Interest Holders would be subject to minimal oversight.

Given the foregoing, the Court cannot find that the creditors in impaired classes that did not vote to accept the Debtor Plan would receive at least as much under the Debtor Plan as they would in an orderly Chapter 7 liquidation. The Court therefore finds that the Debtor has failed to meet its burden of demonstrating that the Debtor Plan satisfies the requirements of § 1129(a)(7).

### 4. Section 1129(a)(11)

Section 1129(a)(11) requires that a plan be feasible in order to be confirmed. A plan is feasible if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "A court may not confirm a plan if its feasibility depends on future refinancing, unless there is an adequate evidentiary showing that such refinancing is likely to occur." *In re Seasons Partners, LLC*, 439 B.R. 505, 515 (Bankr. D. Ariz. 2010). An adequate evidentiary showing requires more than conclusory statements and opinions. *E.g., In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 489-90 (Bankr. S.D. Ohio 2011); *In re Multiut Corp.*, 449 B.R. 323, 346 (Bankr. N.D. Ill. 2011). "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the [plan proponent] can possibly attain after confirmation." *Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw.,*

*Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 *Collier on Bankruptcy* ¶ 1129.02[11] at 1129-34 (15th ed. 1984)).

As discussed above, there are three funding sources for the Debtor Plan, aside from the Debtor's cash on hand: (1) the New Value Contribution; (2) the Debtor's Net Revenues; and (3) proceeds from the Refinance, Debtor Sale, or Court Auction.

FCB argues that: (a) the Debtor has failed to demonstrate that it has sufficient cash flow to fund both its operations and its plan obligations; (b) the feasibility of the Debtor Plan depends largely on the Refinance, which the Debtor has failed to show it will be able to complete; and (c) if the Debtor is unable to complete the Refinance within the time allotted, the Debtor Plan proposes a sale of the Property under terms that are not feasible.

Brycon similarly argues that the Debtor has failed to submit sufficient evidence and detail to establish that the Debtor Plan is feasible, and that the Debtor Plan relies upon speculative refinancing.

### a. Feasibility of the New Value Contribution

The Debtor Plan acknowledges that the New Value Contribution is a necessary funding source. (Dkt. 419 at § VI.D; Trial Ex. 14 at § VI.D). As explained by the Debtor:

> [B]ecause the [Debtor] Plan relies upon the continued operation of the Property as a hotel to generate Net Revenue to pay Creditors, and the current Franchise Agreement expires in January 2026, prior to the end of the life of the Plan, it is necessary for the success of the Plan that the Property be re-flagged (either with the current Franchisor or a new franchisor) when the current Franchise Agreement expires. In order to do that, the Reorganized Debtor must make the property improvements and incur, and pay for, the PIP Expenses. It is anticipated that the Debtor will not generate sufficient Retained Net Revenues to pay for all PIP Expenses from the Debtor's revenues. Moreover, the PIP Expenses will need to be made to generate sufficient value of the Property to pay the balloon payments to creditors as provided in the Plan. Accordingly, the New Value Contribution is "necessary" to the Debtor's successful reorganization.

(Dkt. 419 at § VI.D; Trial Ex. 14 at § VI.D).

The Debtor Plan expressly provides that the New Value Contribution is to be made "by the Interest Holders[,]" which are defined as the "person or persons owning an Allowed Interest in the Debtor as of the Petition Date," i.e. the S & R Trust and the J Trust, and given the nature of those trusts, Mr. S. Khangura, Ms. R. Khangura, and Mr. J. Khangura. (Dkt. 419 at § II; Trial Ex. 14 at § II; *see also* Dkt. 508 at 4, ¶¶ 13-14).

As an initial matter, the Debtor Plan provides that the Interest Holders will contribute $100,000 of the New Value Contribution by the Effective Date to help pay the Effective Date Payments.[38] No evidence has been presented to the Court that the Interest Holders have sufficient funds to make the Effective Date contribution. In fact, Mr. S. Khangura testified that he and Mr. J. Khangura do not have sufficient cash available to fund the New Value Contribution. (12/11/2024 Trial Tr. 165:11-17). As such, according to Mr. S. Khangura, the Interest Holders would need to use equity from a refinancing of the Fairfield Inn and/or Residence Inn in order to fund the New Value Contribution.[39] (12/11/2024 Trial Tr. 165:18-166:5).

Although Mr. Leach and Mr. S. Khangura testified that, in their opinions, the Debtor and Optima will be able to refinance one or both of their respective properties (Dkt. 506 at 5, ¶ 28; Dkt. 508 at 18, ¶ 112), no term sheets or commitment letters pertaining to a refinancing of the Property or either of the Affiliate Properties were admitted into evidence before the Court.[40] Further, no evidence was submitted to the Court from any of the non-debtor Affiliates committing to contribute funds to the Interest Holders to fund the Debtor Plan.[41] There is also no evidence before the Court, beyond the conclusory statements of Mr. S. Khangura, that funds generated

[38] The Debtor estimates that Effective Date payments under the Debtor Plan would total approximately $650,000. (Dkt. 418 at Ex. B; Trial Ex. 13 at Ex. B). The Debtor's most recent operating report reflects gross monthly income of approximately $294,000, monthly expenses of approximately $385,000, outstanding accounts receivable of $49,598, $261,886 in post-petition payables, and an ending cash balance of $937,056. (Dkt. 559). The Debtor has made no showing that the Effective Date payments required under its plan could be made without the $100,000 initial New Value Contribution.
[39] The Debtor Plan provides that the PIP Expenses may also, or in the alternative, be funded by PIP Financing. (Dkt. 419 at § II; Trial Ex. 14 at § II). However, there was no testimony or evidence to suggest that PIP Financing is being pursued or is a feasible source of funding for the PIP Expenses.
[40] After the conclusion of the Confirmation Hearing, the Debtor filed a letter of intent pertaining to a potential refinancing of the Fairfield Inn. (Dkt. 548). Not only is that letter of intent not in evidence before this Court, but the letter of intent that has been filed is, on its face, non-binding and subject to underwriting, committee approval, a site visit, reports, and legal review. (Dkt. 548 at Ex. A).
[41] The Debtor Plan does not contemplate any direct funding by any of the Affiliates.

from a prospective refinance of the Affiliate Properties could be used by the Interest Holders to fund the Debtor Plan. Mr. S. Khangura confirmed during his testimony that the Affiliates have no obligations to the creditors in this case. (12/11/2024 Trial Tr. 206:24-207:2). Mr. Leach confirmed that although the Affiliates are primarily pursuing SBA refinancing, SBA funds loaned to an affiliate cannot be contributed to the Debtor. (12/12/2024 Trial Tr. 28:7-14). By Mr. Khangura's own admission, if the Affiliates' contemplated refinancing does not occur within six months after confirmation of the Debtor Plan, there will be no New Value Contribution. (12/11/2024 Trial Tr. 166:6-9).

Given the foregoing, it is the determination of the Court that the Debtor has failed to demonstrate that the New Value Contribution, which is material to the success of the Debtor Plan, can or would be made, in whole or in part.

### b. Feasibility of the Refinance, Debtor Sale, and Court Auction

In order for the Debtor Plan to be successful, the Debtor must be able to complete the Refinance, or in the alternative, complete the Debtor Sale, or as a last resort, sell the Property at the Court Auction.

### i. Feasibility of the Refinance

The Debtor Plan contemplates that the Debtor will complete the Refinance of its Property within six months of the Effective Date, with the assistance of Mr. Leach, and use the proceeds to pay the allowed secured claims of FCB, the City, and Brycon, in full, which claims total no less than $9,477,000.[42] (Dkt. 419 at § VII.A; Trial Ex. 14 at § VII.A).

As a preliminary matter, the Debtor represented in the Debtor Plan that it would present a term sheet in connection with the confirmation proceedings. (Dkt. 419 at § VII.A; Trial Ex. 14 at § VII.A). However, as discussed above, Mr. Leach and Mr. S. Khangura both confirmed during the Confirmation Hearing that no binding term sheets or commitments for a refinance of the Debtor's Property exist. (12/11/2024 Trial Tr. 162:3-5; 12/12/2024 Trial Tr. 19:6-9).

---

[42] Although Mr. S. Khangura testified that the Debtor intends to challenge certain components secured claims that have been filed in this case (Dkt. 508 at 7, ¶¶ 38, 41-42), no objections to any claims have been filed with the Court.

Mr. S. Khangura and Mr. Leach testified that the Debtor is primarily pursuing SBA-backed refinancing. (12/11/2024 Trial Tr. 160:13-15, 162:9-163:4, 184:6-10, 185:15-17; 12/12/2024 Trial Tr. 42:18-20). Mr. Leach has acknowledged that, due to SBA regulations, in order to obtain SBA financing in the six months after plan confirmation, the Debtor would either need to pay the SBA's claim in full or obtain a special waiver from the SBA. (12/12/2024 Trial Tr. 53:10-54:1, 55:20-56:4). The Debtor Plan does not contemplate payment of the SBA's claim in full until the end of the three-year plan term (Dkt. 419 at § VI.B.4; Trial Ex. 14 at § VI.B.4), and the Debtor has not demonstrated that it has engaged in efforts to obtain a waiver or that it is eligible to obtain a waiver from the SBA. In view of the foregoing, the Court does not find Mr. Leach's or Mr. S. Khangura's testimony that they are confident the Debtor would be able to refinance the Property within the six-month window provided in the Debtor Plan to be convincing.

Mr. Bierman testified that, in his expert opinion, the proposed Refinance is speculative given, among other things, this bankruptcy case and the Debtor's history of defaults, the status of the SBA's loan and claim in this case, and the amount of the secured debt encumbering the Property as compared against the value of the Property. (12/12/2024 Trial Tr. 168:18-169:24, 171:4-17; Dkt. 504 at 19-21; Trial Ex. 48 at 7-9; *see also* 12/12/2024 Trial Tr. 169:25-170:19). The Court finds Mr. Bierman's testimony to be persuasive.

It is the determination of the Court that the Debtor has failed to provide evidence that the Refinance is feasible or would generate sufficient funds to pay all allowed secured claims in full, as required by the Debtor Plan.

### ii. Feasibility of the Debtor Sale

The Debtor Plan provides that "[i]n the event that the refinancing does not occur within six months of the Effective Date of the Plan, then one week following the six-month anniversary of the Effective Date, the Debtor will list the Property for sale with a broker familiar with the subject hospitality market . . . ." (Dkt. 419 at § VII.A; Trial Ex. 14 at § VII.A). The Debtor Plan contemplates a closing of a sale within six months of the retention of a broker. (Dkt. 419 at § VII.A; Trial Ex. 14 at § VII.A). However, at the Confirmation Hearing, Mr. S. Khangura

testified that the Debtor may decide not to hire a broker to market the Property. (12/11/2024 Trial Tr. 181:14-20).[43] The remaining deadlines in the Debtor Plan pertaining to the Debtor Sale are calculated based upon the date a broker is retained, rendering such deadlines meaningless if a broker is not retained. (*See* Dkt. 419 at § VII.A; Trial Ex. 14 at § VII.A).

Mr. S. Khangura further testified that it was his understanding that the Debtor would be authorized under the Debtor Plan to intentionally market the Property narrowly, or only to parties the Debtor knows are not interested in purchasing the Property, in order to avoid a sale of the Property.[44] (12/11/2024 Trial Tr. 180:1-181:1). Mr. S. Khangura's testimony is consistent with the Debtor Plan, which gives the Debtor: (a) full discretion to market the Property in any manner of its choosing; (b) full and unfettered discretion to accept or reject any offer it receives during the Debtor Sale period; and (c) discretion to extend the timeline for a sale of the Property. (Dkt. 419 at § VII.A; Trial Ex. 14 at § VII.A). In sum, as proposed, the Debtor Plan would allow the Debtor to run a sale process, which does not require a transparent marketing process aimed at achieving the highest and best price for the benefit of creditors, and which takes place outside of the supervision of the Court.

Based upon the testimony and evidence presented, it is the determination of the Court that, as proposed, the Debtor Sale is not feasible.

### iii. Feasibility of the Court Auction

The Debtor Plan provides that "[i]f the Property is not sold (or FCB's and Brycon's Allowed Secured Claims are not otherwise paid in full) within fifteen (15) months following the Confirmation Date, the Debtor's case will be reopened and the Debtor will sell the Property at a Court-supervised auction." (Dkt. 457 at § III.C; Trial Ex. 22 at § III.C).

The Debtor Plan does not contain any timeline or proposed procedures for the Court Auction. The Debtor Plan does not address, among other things: (a) pursuant to what mechanism

---

[43] The Debtor Plan also contains a provision according to which the Reorganized Debtor would have the authority to retain professionals to market and/or sell assets of the Reorganized Debtor "(if such a sale is deemed prudent by the Reorganized Debtor in its sole and absolute discretion)." (Dkt. 419 at § VII.C; Trial Ex. 14 at § VII.C).

[44] Mr. S. Khangura testified that the Debtor's principals do not want to sell the Property. (12/11/2024 Trial Tr. 180:15-17).

the case would be reopened; (b) any details regarding how the auction would be conducted, including marketing, bidding procedures, or buyer qualifications; or (c) a timeline for conducting the auction.

In sum, the Debtor Plan proposes a Refinance that the Debtor has not shown is feasible, in the alternative, a Debtor Sale that the Debtor's representative testified the Interest Holders do not support and may not seriously pursue, and as a last resort, a Court Auction that sets forth no parameters or procedures whatsoever. Without a successful Refinance, Debtor Sale, or Court Auction the Debtor cannot fund its plan.[45] In sum, the Debtor has not established that its plan satisfies the feasibility requirements of § 1129(a)(11).[46]

### 5. Section 1129(b)

As discussed above, the Debtor has failed to establish that the Debtor Plan satisfies §§ 1129(a)(1), (a)(7), and (a)(11). Thus, the Debtor Plan cannot be confirmed under § 1129(b). Even if the Debtor Plan did satisfy the applicable provisions of § 1129(a), it is the determination of the Court that the Debtor Plan nevertheless fails to satisfy the requirements for confirmation under § 1129(b).

Pursuant to § 1129(b), the Debtor Plan must be fair and equitable with respect to impaired classes that have not accepted the plan. As discussed above, the classes consisting of FCB's, Brycon's, the City's, and the SBA's allowed secured claims, voted to reject or are deemed to reject the Debtor Plan.[47]

### a. The Debtor Plan Must Pay Secured Creditors Who Have Not Accepted the Debtor Plan the Full Amount of their Allowed Claims

Section § 1129(b)(2)(A) provides that in order for a plan to be fair and equitable with respect to a class of secured claims that is impaired under the plan and has not accepted the plan, the plan must provide:

---

[45] The Court also notes that although the declaration of Mr. S. Khangura referred to included piecemeal amended projections, the Debtor has not submitted a complete set of updated projections for the Court's consideration.

[46] In effect, the Debtor Plan therefore also fails to provide adequate means for the plan's implementation, violating § 1123(a)(5), and thus § 1129(a)(1).

[47] As noted above, it is unclear whether the priority tax class is deemed to accept or reject the Debtor Plan. See *supra* n. 20.

>> **(i) (I)** that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

>>> **(II)** that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

>> **(ii)** for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

>> **(iii)** for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

For purposes of § 1129(b)(2)(A)(i), "[t]he interest rate chosen must ensure that the creditor receives the present value of its secured claim through the payments contemplated by the plan of reorganization." *First Southern Nat'l Bank v. Sunnyslope Hous. Ltd. P'ship (In re Sunnyslope Hous. Ltd. P'ship),* 859 F.3d 637, 646 (9th Cir. 2017), *as amended* (June 23, 2017); *see also In re Bashas' Inc.*, 437 B.R. at 919. "If a Chapter 11 plan proposes payment of an interest rate below the 'range of prevailing market rates for loans of comparable risk and duration' or which does not take into account the actual risk of that loan, confirmation must be denied because the deferred payments will not yield the present value of the claim and, therefore, the plan is not 'fair and equitable' and will not satisfy § 1129(b)(2)(A)(i)(II)." *In re Bashas' Inc.*, 437 B.R. at 919.

Courts typically use the "formula" or "prime-plus" approach endorsed by a plurality in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951, 158 L. Ed. 2d 787 (2004) to determine the appropriate interest rate for purposes of § 1129(b)(2)(A). *See, e.g., In re Sunnyslope Hous. Ltd. P'ship,* 859 F.3d at 646; *In re Red Mountain Mach. Co.*, 448 B.R. 1, 9-12 (Bankr. D. Ariz. 2011), *aff'd*, 471 B.R. 242 (D. Ariz. 2012).

> [T]he approach begins by looking to the national prime rate . . . which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends . . . on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

*Till*, 541 U.S. at 478-79.

"The creditor bears the burden of showing that the prime rate does not adequately account for the riskiness of the debtor." *In re Sunnyslope Hous. Ltd. P'ship*, 859 F.3d at 646.

The Debtor proposes to pay FCB and Brycon the amount of their allowed secured claims in full, with interest at a rate of 8.5% per annum. The Debtor proposes to pay the City its allowed secured claim in full with interest at a rate of 6.0% per annum, and the Debtor proposes to pay the SBA its allowed secured claim in full with interest at 3.75% per annum.

For purposes of determining whether the interest rates proposed in the Debtor Plan are sufficient to allow FCB, Brycon, the City, and the SBA to recover the present value of their claims, the Debtor encourages the Court to use the 26-week Treasury Bill rate,[48] rather than the prime rate,[49] as the base rate, citing the volatile nature of the prime rate in recent years. The Court is unpersuaded by the Debtor's arguments.

Mr. Bierman testified that, in his opinion, the prime rate, which is the rate that major banks offer to their best commercial borrowers, should be used as the base rate when determining the rate of interest that must be paid to secured creditors under a § 1129(b) cramdown. (Dkt. 504 at 26; Trial Ex. 48 at 16; Dkt. 12/11/2024 Trial Tr. 133:6-17). Mr. Bierman's analysis is consistent with *Till* and is persuasive to this Court. The Court therefore begins with the prime rate.

---

[48] The 26-week Treasury Bill rate is approximately 4.06%.

[49] The prime rate is currently 7.50%.

With respect to the risk premium that should be added to the prime rate, Mr. Bierman testified that an appropriate risk premium in this case would be at least 2.75%. (12/11/2024 Trial Tr. 133:18-25; Dkt. 504 at 26-28; Trial Ex. 48 at 14-16). Mr. Bierman reached this conclusion based upon his analysis of the feasibility and risk associated with the Debtor Plan, the circumstances surrounding the Debtor's estate, the Debtor's default risk, and the nature of the Debtor's property, among other factors. (Dkt. 504 at 26-28; Trial Ex. 48 at 14-16). The Debtor did not offer any expert testimony to support its proposed interest rate or to rebut Mr. Bierman's report and expert testimony, [50] and the Court finds Mr. Bierman's risk analysis to be credible.

Given the foregoing, in order to satisfy § 1129(b)(2)(A)(i), the rate of interest that must be paid to secured creditors who have not voted to accept the Debtor Plan is no less than the prime rate plus an upward risk adjustment of 2.75%.

### b. The Debtor Plan Cannot Unfairly Shift Risk of Plan's Failure to Creditors

FCB and Brycon argue that the Debtor Plan is not fair and equitable within the meaning of § 1129(b) because it unreasonably shifts the risk of failure onto creditors. Although § 1129(b) does not explicitly prohibit shifting of the risk of a plan's failure onto creditors, § 1129(b)(2) uses the word "includes," which indicates that the fair and equitable conditions set forth in § 1129(b)(2) are not exclusive. 11 U.S.C. § 102(3); *see In re Red Mountain Mach. Co.*, 448 B.R. at 13.

Courts have recognized implied fair and equitable requirements, including a requirement that a plan not impose an unreasonable risk of failure on secured creditors. *E.g., In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 434-436 (C.D. Cal. 1993); *In re Reid Park Prop., LLC*, No. 4:11-bk-15267-EWH, 2012 WL 5462919, at *9 (Bankr. D. Ariz. Nov. 7, 2012). "Ultimately, the final determination of whether a plan is fair and equitable requires a context-specific analysis based on the facts of each case." *In re Reid Park Prop., LLC*, 2012 WL 5462919, at *9.

In this case, the Debtor Plan is, at best, vague as to what the Debtor is required to do and when. As discussed above, the Debtor Plan provides for no Court oversight during the Refinance

---

[50] The Court does not find Mr. S. Khangura's lay witness testimony regarding the interest rate that should be applied to FCB and Brycon's claims to be persuasive.

period or the Debtor Sale period. The Debtor Plan does not provide any specifics on how the Property would be marketed, who would do the marketing, the requirements of any such marketing, or the parameters for considering offers. The Debtor Plan does not disclose whether the Debtor may continue to seek refinancing after the six-month refinancing window expires or specify any procedures or details regarding the Court Auction process.

This case has been pending for nearly four years. If the Debtor Plan were to be confirmed, creditors could be forced to wait an additional fifteen months to allow the Debtor additional time to refinance and/or pursue a sale if the Debtor, in its discretion, opts to pursue a sale. After the expiration of the fifteen-month period, creditors' only remedy would be to force a reopening of this bankruptcy case and pursue the Court Auction, which, as proposed, would likely lead to additional litigation, costs, and delays. Mr. S. Khangura has acknowledged that the Debtor Plan primarily benefits the Interest Holders (12/11/2024 Trial Tr. 171:24-172:2), and his testimony is supported by the record.

In sum, the Debtor Plan lays the groundwork for further delays and prejudice to creditors to the benefit of the Interest Holders. It is the determination of the Court that, given the totality of the circumstances, the Debtor Plan unreasonably shifts the risk of a plan default onto creditors, and therefore fails to satisfy the requirement that the Debtor Plan be fair and equitable.

### B. The Brycon Plan

The Debtor, Mr. S. Khangura, and Ms. R. Khangura argue that the Brycon Plan cannot be confirmed because it: (1) fails to comply with the executory contract provisions of § 365(d)(2) and therefore fails to comply with § 1129(a)(1); (2) was not proposed in good faith as required by § 1129(a)(3); and (3) is not fair and equitable to the Interest Holders as required by § 1129(b). As noted above, the Debtor also argues for the first time in its post-trial brief that the Brycon Plan's proposed appointment of the Post-Confirmation Trustee fails to satisfy the requirements of § 1129(a)(5).

#### 1. Section 1129(a)(1)

As discussed above, pursuant to § 1129(a)(1), a plan can only be confirmed if it complies with the applicable provisions of the Bankruptcy Code. The Debtor, Mr. S. Khangura, and Ms.

R. Khangura argue that the Brycon Plan violates § 1129(a)(1) because it contains the Rejection Provision, which the parties argue conflicts with § 365(d)(2).

Section 365(d)(2) provides in relevant part that executory contracts and unexpired leases of personal property may be assumed or rejected "before the confirmation of a plan[.]" Pursuant to § 1123(b)(2), "subject to section 365[,]" a plan may "provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected . . . ."

The Rejection Provision would allow the Post-Confirmation Trustee to "file a notice with the Bankruptcy Court after the Confirmation Date, but before the Closing Date, rejecting a previously Assumed Executory Contract[51] or Assumed Unexpired Real & Personal Property Lease."[52] (Dkt. 417 at § 7.4). In its post-trial brief, Brycon asserts, on the one hand, that "post-Confirmation assumption or rejection of an executory contract is not at risk or issue in this case" because "Brycon has indicated it plans to accept all existing executory contracts[,]" and the objection is therefore elevating form over substance. (Dkt. 551 at 9-10). However, Brycon's post-trial brief also includes legal argument in support of what appears to be Brycon's position that executory contracts can be assumed post-confirmation. (Dkt. 551 at 10).

Ultimately, the Court finds the Rejection Provision to be ambiguous. It is unclear whether Brycon is attempting, through the Rejection Provision, to allow the Post-Confirmation Trustee the ability to somehow retract the assumption of executory contracts and unexpired leases and invoke the rejection damages caps set forth in the Bankruptcy Code, or whether Brycon is only preserving the Post-Confirmation Trustee's right to reject, and in effect, breach, previously assumed contracts and leases, thus allowing creditors to assert all contractual damages, potentially as administrative claims.

---

[51] "Assumed Executory Contract or Contracts" is defined to "refer to and mean every unexpired executory contract that is being assumed under 11 U.S.C. § 365 pursuant to [the Brycon] Plan that are identified on Schedule 1.1 to [the Brycon] Plan." (Dkt. 417 at § 2.8).

[52] "Assumed Unexpired Real & Personal Property Leases" is defined to "refer to and mean the unexpired real and personal property leases that are specifically identified in Schedule 1.2 to [the Brycon] Plan that are being assumed pursuant to [the Brycon] Plan." (Dkt. 417 at § 2.9).

To the extent the former was intended, the Rejection Provision is inconsistent with the plain language of § 365(d)(2) and § 1123(b)(2), which set confirmation as the final deadline for assumption or rejection of executory contracts and unexpired leases, [53] and the Rejection Provision must therefore be stricken from the Brycon Plan. To the extent the Rejection Provision is intended to provide that the Post-Confirmation Trustee may reject previously assumed executory contracts and unexpired leases, it would authorize the Post-Confirmation Trustee to breach such agreements and bind the Debtor to the termination and damages provisions in such contracts and leases. While not clearly violative of § 365(d)(2) or § 1123(b)(2), under this scenario, the Brycon Plan fails to account for the financial ramifications of any such post-assumption rejections.[54]

Based upon the ambiguous language of the Rejection Provision and lack of clarification in Brycon's post-trial brief, the Court finds that the Brycon Plan fails to comply with § 1129(a)(1).

### 2. Section 1129(a)(3)

As discussed above, pursuant to § 1129(a)(3), a plan can only be confirmed if it "has been proposed in good faith and not by any means forbidden by law." In the Ninth Circuit, the Court need only look to the circumstances surrounding the proposal of the plan, and the Court need not look to the terms of the plan itself. *Garvin*, 922 F.3d at 1035. A plan is proposed in good faith if the proposal of the plan is consistent with the objectives and purposes of the Bankruptcy Code. *Id.*; *In re Orange Cnty. Bail Bonds, Inc.*, 638 B.R. at 147 (quoting *In re Sylmar Plaza, L.P.*, 314 F. 3d at 1047).

The Debtor, Mr. S. Khangura, and Ms. R. Khangura argue that the Brycon Plan fails to satisfy the good faith requirement of § 1129(a)(3) because it does not facilitate the Debtor's

---

[53] The Court does not find the *DJS Properties, L.P. v. Simplot*, 397 B.R. 493, 498 (D. Idaho 2008) decision cited by Brycon in support of the proposition that executory contracts and unexpired leases may be assumed or rejected post-confirmation to be persuasive. "In all chapters except chapter 7, an executory contract may be assumed or rejected at any time before plan confirmation." *In re JZ L.L.C.*, 371 B.R. 412, 422 (9th Cir. BAP 2007) (internal quotation omitted).

[54] The subsequent rejection of an assumed contract constitutes a breach under § 365(g)(2)(A) giving rise to an administrative claim for damages. *In re Frontier Prop., Inc.*, 979 F.2d 1358, 1366 (9th Cir. 1992).

rehabilitation, would not maximize or even ensure a recovery to creditors other than FCB, and does not preserve the value of the Interest Holders' equity in the Debtor.

The Brycon Plan proposes an orderly liquidation of the Debtor's assets by a neutral third-party and a distribution of those assets in a manner consistent with the Bankruptcy Code. Although the terms of the Brycon Plan contain ambiguities and deficiencies, which are discussed herein, given the circumstances surrounding the proposal of the Brycon Plan, which plan was proposed only after the Debtor had nearly three years in which to confirm a plan, the Court finds that the Brycon Plan was proposed in good faith and not by any means forbidden by law, thus satisfying § 1129(a)(3).

### 3. Section 1129(a)(5)

Although the Debtor's § 1129(a)(5) objection was not timely raised, given the Court's affirmative, independent duty to apply the provisions of § 1129,[55] and given the provisions of the Brycon Plan, the Court will consider whether the Brycon Plan complies with § 1129(a)(5).

Section 1129(a)(5) provides in relevant part that: (i) a plan proponent must "disclose[] the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, . . . or a successor to the debtor under the plan;" and (ii) "the appointment to, or continuance in, such office of such individual [must be] consistent with the interests of creditors and equity security holders and with public policy[.]"

As discussed above, the Brycon Plan provides for the appointment of a Post-Confirmation Trustee and gives the Post-Confirmation Trustee unfettered access to hire additional persons and/or entities to assist him in carrying out his duties under the Brycon Plan. The Brycon Plan does not provide an estimate of the cost of retaining the Post-Confirmation Trustee, does not include a discussion of who the Post-Confirmation Trustee anticipates employing, or estimate the additional fees that may be incurred and paid to those employed by the Post-Confirmation Trustee.[56]

---

[55] *In re Ambanc La Mesa Ltd., Pship*, 115 F.3d at 653.

[56] No separate liquidating trust agreement, nor other form of agreement with the proposed Post-Confirmation Trustee, has been submitted to the Court, and as noted above, the proposed Post-Confirmation Trustee did not testify at the Confirmation Hearing.

The Brycon Plan sufficiently discloses the identity of the proposed Post-Confirmation Trustee and, given the circumstances of this case, the appointment of a Post-Confirmation Trustee to serve as a neutral third-party to liquidate the assets of the estate would be consistent with the interests of creditors, equity security holders, and public policy. However, the Brycon Plan, as drafted, fails to disclose sufficient information to allow the Court to determine whether the specific terms of the Post-Confirmation Trustee's appointment are consistent with the interests of creditors, equity security holders, and public policy. Brycon has, therefore, failed to satisfy its burden of establishing that the Brycon Plan satisfies the requirements of § 1129(a)(5).

### 4. Section 1129(a)(7)

As discussed above, the Court has an affirmative, independent duty to apply the provisions of § 1129.[57] Given the Court's independent duty, Brycon's representations to creditors about the return they can expect to receive under the Brycon Plan, and the substance of the objections that have been raised, the Court is compelled to analyze whether the Brycon Plan satisfies the best interests of creditors test set forth in § 1129(a)(7)(A).

Section 1129(a)(7)(A) requires that each holder of a claim or interest in an impaired class either accept the plan or receive or retain under the plan at least as much as the holder of that claim would receive in a Chapter 7 liquidation. 11 U.S.C. § 1129(a)(7)(A); *In re Bashas' Inc.*, 437 B.R. at 914. In order to determine whether a plan satisfies § 1129(a)(7)(A), courts must determine what creditors and interest holders would receive under a hypothetical liquidation, and compare that hypothetical return with what creditors and interest holders are slated to receive under the proposed plan. *In re Tenderloin Health*, 849 F.3d at 1237. To satisfy § 1129(a)(7)(A), the plan proponent must show that every holder of a claim or interest in an impaired class that has voted to reject the plan will receive or retain at least as much as it would receive if the Debtor were liquidated under Chapter 7. 11 U.S.C. § 1129(a)(7)(A); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 657.

"A Chapter 11 plan, even though a liquidating plan, must still conform to the same statutory requirements of any other Chapter 11 reorganization." *U.S. Internal Revenue Serv. V.*

---

[57] *In re Ambanc La Mesa Ltd., Pship*, 115 F.3d at 653.

*Deer Park, Inc. (In re Deer Park, Inc.)*, 136 B.R. 815, 818 (9th Cir. BAP 1991), *aff'd,* 10 F.3d 1478 (9th Cir. 1993). "[I]t cannot be assumed that a liquidating plan would yield at least as much as a chapter 7 liquidation." *Farwest Pump Co. v. Official Committee of Unsecured Creditors (In re Farwest Pump Co.)*, BAP No. AZ-19-1274-LBT, 2020 WL 5588808, at *9 (9th Cir. BAP Sept. 18, 2020).

Brycon asserts that under the Brycon Plan, the Debtor's real property would generate $12,775,000 in gross proceeds, the Debtor's personal property would generate $1,200,000 in gross proceeds, and that Brycon's proposed liquidation would result in $13,800,000 for creditors and interest holders.[58] After the payment of secured claims, which Brycon estimates to be $10,000,000, and after payment of administrative expenses, which Brycon estimates will total $1,000,000, Brycon calculates that there would be $2,975,000 available for unsecured creditors and interest holders. (Dkt. 551 at 4).

Brycon asserts that under a Chapter 7 liquidation, the Debtor's real property would generate only $7,000,000 in gross proceeds, administrative expenses totaling an estimated $1,500,000 would have to be paid, and a Chapter 7 liquidation would therefore generate no net proceeds for unsecured creditors or interest holders. (Dkt. 551 at 5).

Brycon's liquidation analysis is materially flawed for at least two reasons.

First, the $12,755,000 value that Brycon asserts the Debtor's real property would yield under its plan represents the estimated fair market value of the Property. Under the terms of the Brycon Plan, absent consent from FCB, the Post-Confirmation Trustee would be required to enter into a definitive agreement with one or more purchasers for a sale of the Property within twelve weeks, i.e. approximately 90 days, after confirmation of the Brycon Plan, and the Post-Confirmation Trustee would be required to close on a sale of the Property no later than sixteen weeks after confirmation. (Dkt. 417 at Sched. 2, ¶¶ 6-7; *see also* Dkt. 417 at § 2.30; 12/11/2024 Trial Tr. 59:15-62:4). According to the 2024 Newmark Appraisal, which was submitted by Brycon in support of its plan, approximately 90 days of marketing and exposure time is expected

---

[58] Brycon's liquidation numbers do not add up.

to generate liquidation value, which Mr. Eschmeyer has estimated to be $7,800,000.[59] (Dkt. 505 at 160; Trial Ex. 47 at 152). Thus, contrary to Brycon's position that the sale of the Property proposed in the Brycon Plan would generate no less than $12,775,000,[60] according to Brycon's own expert, the sale Brycon has proposed is a liquidation sale that would be expected to generate sale proceeds totaling less than the amount of the senior lienholder's claim in this case.

Second, there is no evidence before the Court that a Chapter 7 liquidation would cost the estate $500,000 in additional administrative expenses than the liquidation proposed in the Brycon Plan. Mr. Hughes did not testify, and Brycon has not otherwise provided any evidence to support its estimate that administrative expenses incurred under its plan would total approximately $1,000,000, versus $1,500,000 in a Chapter 7 liquidation. Under the Brycon Plan, the Post-Confirmation Trustee's fees, which would presumably accrue at the hourly rate of $525 per hour, and the fees of any persons or entities hired to assist him, would be subject to no review mechanism, oversight, or dollar cap.[61] A Chapter 7 trustee's fees, on the other hand, are statutorily capped,[62] and the fees sought by any professionals hired to assist a Chapter 7 trustee are subject to a reasonableness review and Court approval. 11 U.S.C. §§ 326 & 330. It is difficult to imagine that the costs and expenses incurred by the Post-Confirmation Trustee would be less than those incurred by a Chapter 7 trustee.

Based upon the foregoing, the evidence does not reflect that the Brycon Plan would generate at least as much for creditors and interest holders as a Chapter 7 liquidation, and in fact, suggests that the Brycon Plan may yield less than a Chapter 7 liquidation. Based upon the forgoing, the Court cannot find that the Brycon Plan satisfies § 1129(a)(7)(A).

///

///

---

[59] This figure appears to include not just the real property, but also furniture, fixtures, and equipment.

[60] This figure does not take into account any personal property. (Dkt. 551 at 4).

[61] In addition to the foregoing, as discussed in the § 1129(a)(1) analysis above, the Brycon Plan and liquidation analysis may fail to take into account the damages that may result in the event of a post-assumption rejection of any of the Debtor's executory contracts and unexpired leases.

[62] A Chapter 7 trustee's compensation cannot exceed 25% on the first $5,000 disbursed, 10% on any amounts disbursed in excess of $50,000 but not in excess of $1,000,000, and 3% on any amounts disbursed in excess of $1,000,000, excluding disbursements made to the debtor. 11 U.S.C. § 326(a).

### 5. Section 1129(b)

As discussed above, Brycon has failed to establish that the Brycon Plan satisfies §§ 1129(a)(1), (a)(5), and (a)(7). Thus, the Brycon Plan cannot be confirmed under § 1129(b). Even if the Brycon Plan did satisfy the applicable provisions of § 1129(a), it is the determination of the Court that the Brycon Plan nevertheless fails to satisfy the requirements for confirmation under § 1129(b).

As discussed above, pursuant to § 1129(b)(2), the Brycon Plan must be fair and equitable with respect to impaired classes that have not accepted the plan. The Debtor, Mr. S. Khangura, and Ms. R. Khangura argue that the Brycon Plan is not fair and equitable to Interest Holders because it fails to provide that Interest Holders will recover the value of their interests in the Debtor.

As a preliminary matter, Brycon argues in its post-trial brief that the Interest Holders are not impaired by the Brycon Plan, and as such, are not entitled to raise fair and equitable objections to the Brycon Plan. (Dkt. 551 at 11). However, the Brycon Plan and Brycon disclosure statement expressly provide that the Interest Holders are impaired under the Brycon Plan. (Dkt. 416 at §§ III.C, VI.A.14; Trial Ex. 12 at §§ III.C., VI.A.14; Dkt. 417 at § 5.13). Further, pursuant to § 1124(1), "a class of . . . interests is impaired under a plan unless, with respect to each . . . interest of such class, the plan leaves unaltered the legal, equitable, and contractual rights to which such . . . interest entitles the holder of such . . . interest[.]" In this case, given that the Brycon Plan would install a post-confirmation trustee and strip the Interest Holders of their ability to exercise rights related to their membership interests in the Debtor, the Interest Holders are an impaired rejecting class under the Brycon Plan. *See Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1363 (9th Cir. 1986) (finding that shareholders were impaired under a plan that proposed to deprive them of their ability to act in their capacities as shareholders to alter the management of the debtor).

/ / /

/ / /

Pursuant to § 1129(b)(2)(C):

> [T]he condition that a plan be fair and equitable with respect to a class includes the following requirements: [w]ith respect to a class of interests –
>
> (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or
>
> (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

Thus, under the plan language of § 1129(b)(2)(C), interest holders are not entitled to receive or retain the value of their respective interests. They are <u>either</u> entitled to receive or retain the value of their respective interests <u>or</u> the plan must not provide for junior interest holders to receive or retain under the plan anything on account of such junior interests. In this case, there is only one class of interest holders, and § 1129(b)(2)(C) is therefore satisfied.

That being said, as discussed above, the requirements set forth in § 1129(b)(2)(C) are not exclusive. 11 U.S.C. § 1129(b)(2) (providing that "the condition that a plan be fair and equitable . . . includes the following requirements"); 11 U.S.C. § 102(3) ("'includes' . . . [is] not limiting"); *see In re Red Mountain Mach. Co.*, 448 B.R. at 13. "[T]he final determination of whether a plan is fair and equitable requires a context-specific analysis based on the facts of each case." *In re Reid Park Prop., LLC*, 2012 WL 5462919, at *9.

In this case, the parties agree that the Property has a fair market value of no less than $13,000,000, which is more than the sum of the claims against the Debtor. There is nothing in the record before the Court to suggest that fair market value could not reasonably be achieved with sufficient time for marketing of the Property. (*See* 12/11/2024 Trial Tr. 39:5-40:4). As discussed in the § 1129(a)(7) analysis above, under the terms of the Brycon Plan, absent consent from FCB, the Post-Confirmation Trustee would be required to enter into an agreement with one or more purchasers for a sale of the Property within twelve weeks after confirmation and close

on a sale of the Property within sixteen weeks after confirmation, under which timeline the sale would be expected to generate no more than liquidation value. Brycon's own valuation expert has opined that the liquidation value of the Property is $7,800,000, which amount is less than the claim asserted by the senior lienholder, FCB. As such, the evidence reflects that the Brycon Plan would not yield proceeds sufficient to pay anything to junior lienholders, the ADOR, or general unsecured creditors.

Although there are provisions in the Brycon Plan that would allow for an extension of the timelines therein, and which would allow for an orderly sale of the Property that would be expected to yield fair market value, under the terms of the Brycon Plan, any and all such extensions would have to be agreed to by FCB. (*See Dkt*. 417 at Sched. 2, ¶¶ 6-7; 12/11/2024 Trial Tr. 63:1-13). FCB, as the senior lienholder, has no financial incentive to take any action to ensure payments to any other creditors in this case, or a return to Interest Holders on account of their equity interests in the Debtor.[63] (*See* 12/11/2024 Trial Tr. 102:7-18).

In the event one of the timeline "milestones" set forth in the Brycon Plan is not met, the Post-Confirmation Trustee would lose the ability to continue using cash constituting FCB's collateral, and the Post-Confirmation Trustee would therefore lose any and all ability to pursue a sale of the Property as a going concern. Further, although the Brycon Plan provides for the use of cash constituting FCB's collateral consistent with a budget to fund the ongoing operations of the Hotel until the Property is sold, no budget has been submitted to the Court.

In addition to the foregoing, the Brycon Plan does not set a minimum purchase price for the sale of the Property, nor does it discuss whether FCB retains the ability to credit bid on the Property. (12/11/2024 Trial Tr. 56:17-20).

Given the foregoing, it is the determination of the Court that the Brycon Plan is not fair and equitable to either the unsecured creditor classes, which are deemed to reject the Brycon Plan, or the Interest Holders, pursuant to § 1129(b).

---

[63] There is no dispute that a sale of the Property in an amount less than the allowed secured claims in this case would likely not be in Brycon's economic interest, but as discussed above, although Brycon is the proponent of the Brycon Plan, and although the Brycon Plan provides for the appointment of a third-party trustee, FCB would materially control the sale process proposed in the Brycon Plan.

### C. Plan Comparison

Given that neither plan satisfies the applicable requirements of §§ 1129(a) and (b), it is not necessary for the Court to engage in a § 1129(c) analysis at this time.

## VI. <u>Conclusion</u>

Based on the forgoing analysis of all outstanding factual and legal issues, and based on the totality of the evidence presented in this case, the Court finds and concludes that: 1) the Debtor has failed to meet its burden of establishing that the Debtor Plan satisfies the provisions of §§ 1129(a)(1), (a)(7), (a)(11), and (b); and 2) Brycon has failed to meet its burden of establishing that the Brycon Plan satisfies the provisions of §§ 1129(a)(1), (a)(5), (a)(7), and (b).

Wherefore, based upon the foregoing and for good cause shown;

**IT IS HEREBY ORDERED** that the objections to the Debtor Plan are sustained in part and overruled in part.

**IT IS FURTHER ORDERED** that the objections to the Brycon Plan are sustained in part and overruled in part.

**IT IS FURTHER ORDERED** that confirmation of the Debtor Plan is denied.

**IT IS FURTHER ORDERED** that confirmation of the Brycon Plan is denied.

**IT IS FURTHER ORDERED** that the Debtor and Brycon are each granted thirty days from the entry of this Ruling and Order to file an amended plan that addresses the deficiencies discussed herein. If neither party timely files an amended plan, the Court will consider dismissal or conversion of this case, or the appointment of a Chapter 11 trustee, pursuant to § 1112(b).

**DATED AND SIGNED ABOVE.**